**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

| | | |
|---|---|---|
| RICHARD ZINN, Individually and as Sole Shareholder of Excalibur Bagel & Bakery Equipment, Inc., a New Jersey Corporation, and EXCALIBUR BAGEL & BAKERY EQUIPMENT, INC., a New Jersey Corporation, | : : : | |
| Plaintiffs, | : | |
| v. | : | Civ. No. 05-3572 (GEB) |
| KARIN SERUGA, Individually and as Sole Shareholder of Excellent Bakery Equipment Co., a New Jersey Corporation, and EXCELLENT BAKERY EQUIPMENT CO., a New Jersey Corporation, | : : : : | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Defendants. | : | |

_____

**TABLE OF CONTENTS**

| | |
|---|---|
| I.  Introduction | 3 |
| II.  Background | 4 |
| A.  The Parties | 4 |
| B.  The ARTOFEX Marks | 4 |
| C.  Procedural History | 6 |
| III.  Discussion | 7 |
| A.  The Parties' Contentions at Trial | 7 |
| B.  Analysis | 26 |
| 1.  Findings of Fact | 26 |
| 2.  Conclusions of Law | 33 |

| | |
|---|---|
| a.  Whether the Marks are Valid | 33 |
| b.  Zinn/Excalibur's Affirmative Defenses | 42 |
| c.  The Parties' Respective Trademark Infringement and Unfair Competition Claims | 48 |
| d.  Seruga/Excellent's Counterfeiting Claim | 53 |
| e.  Seruga/Excellent's Cybersquatting Claim | 55 |
| f.  Seruga/Excellent's Dilution of the Mark Claim | 56 |
| g.  Seruga/Excellent's Breach of Contract and Interference with Prospective Business Advantage Claims | 58 |
| h.  Seruga/Excellent's Fraud Claim | 59 |
| 3.  Damages | 60 |
| 4.  Attorney's Fees | 76 |
| IV.  Conclusion | 77 |

**BROWN, Chief Judge**

This matter having come before the Court upon the Amended Complaint of Plaintiff Richard Zinn ("Zinn"), Individually and as Sole Shareholder of Excalibur Bagel & Bakery Equipment Co., and Excalibur Bagel & Bakery Equipment Co., a New Jersey Corporation (collectively "Plaintiffs" or "Zinn/Exalibur") for declaratory judgment pursuant to 28 U.S.C. § 2201(a) seeking to invalidate the trademark "ARTOFEX" and coined word "Artofex," United States Patent and Trademark Office ("USPTO") Registration Numbers 231,276 and 3,097,038; and this matter further coming before the Court upon the Counterclaims of Defendant Karen Seruga ("Seruga"), Individually and as Sole Shareholder of Excellent Bakery Equipment Co., a New Jersey Corporation, and Excellent Bakery Co., a New Jersey Corporation (collectively "Defendants" or "Seruga/Excellent") for relief pursuant to theories of trademark infringement, federal counterfeiting, unfair competition, cybersquatting, and

2

mark dilution, in accord with various federal statutes, state statutes, and common laws.  The Court conducted a non-jury trial and had the opportunity to observe the manner and demeanor of the witnesses and to assess their credibility.  See United States v. $33,500 in U.S. Currency, No. 86-3348, 1998 U.S. Dist. LEXIS 19475, at *2 (D.N.J. Aug. 17, 1988).  This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## I.      INTRODUCTION

This matter addresses litigation between former spouses regarding a trademark, ARTOFEX, which is a brand of baking equipment.  Having divorced, the parties opened their respective, competing bakery supply businesses, and they are arguing over the ownership and use of the ARTOFEX Mark in conjunction with these businesses.  Sergua/Excellent aver that Seruga owns the Mark, that it was validly assigned to her, that she previously was the exclusive distributor of ARTOFEX products in the United States, and that because Zinn/Excalibur have used the Mark in various ways, they should be held liable for that infringement.  She also states various other, related causes of action: unfair competition, counterfeiting, cybersquatting, dilution, breach of contract, tortious interference, and fraud.  However, Zinn/Excalibur have likewise brought their own declaratory judgment action, asserting claims of unfair competition, fraud, and false advertising, and ask the Court to determine that Seruga/Excellent do not own the Mark, that it was not validly assigned to Seruga, or alternatively, that it was abandoned.

The parties thus proceeded to trial, and the Court now addresses their claims.  The Court will first briefly recount the factual background and procedural history, before summarizing the parties'

arguments at trial.  The Court will also make its findings of fact and conclusions of law regarding

each of the claims asserted.  Finally, the Court will address the damages that are due.  There are a

number of outstanding motions in limine and other evidentiary objections, and the Court, where

appropriate, will resolve these issues.


## II.    BACKGROUND

### A.    THE PARTIES

Mr. Zinn and Ms. Seruga used to be married, but divorced in 1997.  Prior to their divorce,

they jointly owned two businesses, Excelsior, a seller of bagel and bakery equipment, and Banta, a

manufacturer of printing presses, baking equipment, and parts.  During their ownership of Excelsior,

the company was the sole, exclusive distributor of ARTOFEX products in the United States.

However, in 1995, the parties dissolved these companies, and pursuant to the finalization of their

divorce, they each started their own, competing businesses.  Ms. Seruga is the sole shareholder of

Excellent; Mr. Zinn is the sole shareholder of Excalibur.


### B.    THE ARTOFEX MARKS

The ARTOFEX Mark was first registered with the USPTO by F. Aeschbach, S.A. under

registration number 231,276 ("'276 registration" or "the Mark") on August 16, 1927, and was first

used by the company in 1911.  The '276 registration was reassigned numerous times, and the parties

agree that these assignments contained numerous errors.  According to Seruga/Excellent, Seruga was

assigned the '276 Mark in 2003, and prior to that date, Seruga was the exclusive distributor of new

ARTOFEX products in the United States both in her prior business that she co-owned with Zinn, and

then later in her solely owned business, Excellent.  Seruga/Excellent's trademark attorneys state that they corrected the errors in the '276 registration's assignments and amended the dates of first use to rely on the dates of the first use of Seruga/Excellent predecessors in interest listed in the '276 registration.  On May 30, 2006, the USPTO also issued a second registration for the Mark to Seruga, registration number 3,097,038 ("'038 registration") for the word mark ARTOFEX.  Throughout this opinion, the '276 registration and the '038 registration are referred to collectively as the "ARTOFEX Marks" or "the Marks."

According to Seruga/Excellent, F. Aeschbach SA, a company owned by Fritz Aeschbach, was the originator of the ARTOFEX trademark.  Seruga/Excellent maintain that Excelsior and F. Aeschbach SA entered into an exclusive distributorship agreement in 1977.  Thereafter, Fritz Aeschbach sold F. Aeschbach SA to Ulrich Wampfler, who was later affiliated with F. Aeschbach AG, and later with Artofex AG, and Artofex Engineering Works ("AEW").  Seruga/Excellent submit that F. Aeschbach AG had licensed the ARTOFEX trademark to Kolb ("Kolb"), but retained ownership of the Mark in the United States until 2003.  Seruga/Excellent contend that they obtained the right to use the ARTOFEX Mark through Kolb and Pitec, other licensees of the Mark, and predominantly interacted with Max Kaeser ("Kaeser") and A. Haller ("Haller"), both of whom represented the '276 registration's owner.  Zinn/Excalibur, however, dispute the assignment and ownership history of the ARTOFEX Mark, and argue that in fact Seruga was never validly assigned the Mark because the company from whom she purportedly received it had dissolved by the date that it was allegedly conveyed to her.

### C.    PROCEDURAL HISTORY

The conflicting positions concerning the ARTOFEX Marks' ownership led to litigation.  On April 2, 2004, Seruga filed a complaint against Zinn in New Jersey Superior Court claiming ownership of the '276 registration.  On July 18, 2005, Zinn and Excalibur filed a complaint in this Court against Seruga and Excellent.  The state court action and the federal court action were then consolidated before the Magistrate Judge by consent.  Zinn/Excalibur amended their complaint on August 14, 2006.  Seruga/Excellent filed counterclaims against Plaintiffs on December 22, 2006.  By Order dated August 29, 2007, this Court dismissed with prejudice Counts I, II, and VIII of the Amended Complaint.

After addressing the parties' dispositive motions on July 28, 2007, August 29, 2007, and February 29, 2008, and after the Court denied the parties' respective motions for summary judgment, the issues that remain are Seruga/Excellent's claims of federal trademark infringement (Count I), federal counterfeiting (Count II), federal unfair competition and false designation of origin (Count III), federal cybersquatting (Count IV), infringement, counterfeiting and unfair competition under New Jersey statutory law (Count V), infringement, counterfeiting and unfair competition under New Jersey common law (Count VI), mark dilution under state statutory law (Count VII), mark dilution under common law (Count VIII), and common law fraud, as well as Zinn/Excalibur's claims of mark invalidity (Count III and IV), fraudulent registration (Count V) and unfair competition under 15 U.S.C. § 1125 (Count VI).

This matter proceeded to trial, which took place before this Court on November 21, 24, 25, 26, 2008, and April 1, 2009.

## II.   DISCUSSION

### A.   THE PARTIES' CONTENTIONS AT TRIAL

Seruga/Excellent have brought counter-claims against Zinn/Excalibur for damages that have arisen due to what Seruga/Excellent argue amounts to federal trademark infringement, federal counterfeiting, federal unfair competition and false designation of origin, federal cybersquatting, infringement, counterfeiting and unfair competition under New Jersey statutory law, infringement, counterfeiting and unfair competition under New Jersey common law, mark dilution under state statutory law, and mark dilution under common law.

However, Zinn/Excalibur initially brought this action pursuant to the Declaratory Judgment Act and seek this Court's determination that the Marks at issue are invalid.  The main thrust of Zinn/Excalibur's argument is that "Seruga is the non-owner of an abandoned and invalid mark," and as such, there are no damages resulting from Plaintiffs' use of the Marks.  They also assert claims for false advertising and fraud.

### 1.   Seruga/Excellent's Claim that Zinn/Excalibur are Liable for Infringement and Zinn/Excalibur's Declaratory Judgment Claim regarding Ownership and Validity of the Mark

The parties' primary claims are interconnected.  Specifically, Zinn/Excalibur assert, pursuant to the Declaratory Judgment Act, and in defense to Seruga/Excellent's claim of infringement, that the Mark is not valid and/or that Seruga does not own it.  Therefore, these primary arguments are best summarized in tandem.  Seruga/Excellent assert that they should prevail on their claims for infringement and unfair competition because Seruga is the "owner and only authorized user of the ARTOFEX trademark in the United States" and Zinn/Excalibur use and have used the Mark in

violation of Seruga/Excellent's rights for the past fifteen years.  (Docket Entry No. 163 at 41.)
Defendants assert that this Court should find Zinn/Excalibur liable for infringement and unfair
competition under the Lanham Act, and that "[t]he elements for a claim of trademark infringement
. . . are the same as a claim for unfair competition" under the Lanham Act and New Jersey state and
common law.  (Id.) (citations omitted).

Seruga/Excellent maintain that Seruga's '276 registration is valid, is incontestable, and is
owned by Seruga.  In support, Seruga/Excellent maintain that "the '276 registration . . . has been
recorded and acknowledged by the [US]PTO" and that pursuant to 15 U.S.C. §1060, that fact "is
prima facie evidence of the execution of the assignment."   (Id. at 42 to 43.)   Further,
Seruga/Excellent assert that Seruga "owns the '038 registration for the coined word mark
ARTOFEX." (Id. at 43.) Seruga/Excellent argue that given these registrations with the USPTO, the
Court should adhere to the strong presumption of validity of these Marks.  (Id.)

Seruga/Excellent seemingly argue that even if the Court finds that these Marks have not been
properly registered, they should still prevail under common law because "trademark rights arise
through use," and as an exclusive distributor, Seruga/Excellent have standing to sue Zinn/Excalibur
under the Lanham Act.  ((Id. at 44) (citing 5 J. Thomas McCarthy, Trademarks and Unfair
Competition §27:20-27:23 (3d ed. 2006)).  Seruga/Excellent maintain that the Lanham Act provides
for the means to recover "to 'any person' damaged by violations of the Lanham Act," pursuant to
15 U.S.C. §1117.  Seruga/Excellent, therefore, aver that they are entitled to damages prior to the
2003 assignment of the '276 Mark when "Defendants were the sole agent and authorized use[r] of
the ARTOFEX mark in the United States."  (Docket Entry No. 163 at 45.)

Seruga/Excellent also maintain that Zinn/Excalibur's use of the Mark is likely to cause

confusion insofar as they "have been using a mark that is identical to Defendants' mark on goods that are identical to Defendants' goods for [fifteen] years." (Id.) Seruga/Excellent also point out that Zinn acknowledged that "the marks are identical and the goods are competing." (Id.) Further, in reference to the Lapp factors, see Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983), Seruga/Excellent argue that their "[c]onsideration . . . shows Plaintiffs are liable on Defendants' counterclaims of infringement and unfair competition." (Id. at 47.) Specifically, with respect to the degree of similarity factor, Seruga/Excellent argue that "Plaintiffs have used the ARTOFEX mark in a myriad of ways that are not only likely to cause confusion, but have caused confusion," citing to the deposition testimony of several customers. (Id. at 47 to 49.) Seruga/Excellent also argue, with regard to the second Lapp factor, that the ARTOFEX mark is strong, and such a finding mitigates in their favor. (Id. at 50.) With respect to the third factor, namely that which considers the price of the goods and the care of purchasers, Seruga/Excellent argue that when a product is more expensive, a consumer exercises greater care in purchasing it, but "this factor is less significant where the mark and goods are identical" as they are here. (Id. at 51.) Seruga/Excellent point out that "Mr. Zinn testified that Plaintiffs' version of the machines have nearly identical specifications to original ARTOFEX machines" and that because "Zinn does not tell the customer that Excalibur is not providing genuine 'ARTOFEX' products," "such acts increase the likelihood of confusion." (Id. at 51 to 52.) Seruga/Excellent also cite the various depositions of customers to support their argument that customers have actually been confused as a result of Zinn/Excalibur's actions. (Id. at 52.) Specifically, Seruga/Excellent cite an e-mail from Busken Bakery (DX333), and the experiences that were described of Sara Lee, Grande Cheese, Entenmann's, and Joseph's Pasta. (Docket Entry No. 163 at 55 to 57.)

9

Seruga/Excellent also argue that Zinn/Excalibur intended to adopt the ARTOFEX mark, which can be seen from the evidence at trial, and therefore that <u>Lapp</u> factor also weighs in Defendants' favor. (<u>Id.</u> at 57.) Specifically, Seruga/Excellent argue that the evidence shows that "Zinn harbors resentment toward his former wife," and therefore, he "devised a scheme to use the ARTOFEX mark in every conceivable way" despite legal warnings and notice regarding the Mark's registration. (<u>Id.</u> at 58 to 59.) With regard to whether the parties' goods are marketed through the same trade channels, Seruga/Excellent argue that both Excalibur and Excellent avail themselves of the same media for advertising and that they both attend the same trade shows. (<u>Id.</u> at 60.) For support, Seruga/Excellent cite various customers' depositions and exhibits that were admitted during trial. (<u>Id.</u>) Seruga/Excellent also argue that "the parties are competing, have overlapping customers and . . . sell overlapping goods." (<u>Id.</u>) Finally, Seruga/Excellent maintain that because the goods are overlapping, there is a greater likelihood of confusion when Zinn/Excalibur use the ARTOFEX Mark.

Seruga/Excellent argue that the evidence shows that "quality control has been adduced at trial from the parties as well as from the deposition testimony of Max Kaeser, the manager of the ARTOFEX department for F. Aeschbach, Kolb/Bako Service and Pitec." (Docket Entry No. 163 at 78.) Defendants also note that "[p]roduct returns to Ms. Seruga have been discussed with Mr. Kaeser and others, and Mr. Kaeser and Ms. Seruga have been in regular consultation over the ARTOFEX products for years." (<u>Id.</u> at 79.)

Seruga/Excellent argue that the Court should find Zinn/Excalibur liable for Counts I, III, V, and VI in the federal action, and Counts IV, V, and VI of the consolidated state action because the evidence and consideration of the <u>Lapp</u> factors show that "Defendants have clearly established a

likelihood of confusion between the respective marks" based upon the undisputed facts.

However, Zinn/Exclibur argue that Seruga/Excellent do not own the Mark and that therefore, any use made of the Mark did not constitute infringement.  Zinn/Excalibur argue that on May 24, 1989, F. Aeschbach AG transferred the '276 Mark to Artofex AG, with the goodwill, and recorded this event with the USPTO.  (Docket Entry No. 161 at 31; Docket Entry No. 164 at 6.) Zinn/Excalibur maintain that Artofex AG did not dissolve until 1994.  (Id.) Zinn/Excalibur further claim that Artofex AG, on February 28, 1995, transferred the '276 Mark to Artofex Engineering Works ("AEW"), including the good will, and it was filed with the USPTO.  (Docket Entry No. 161 at 31.) Zinn/Excalibur claim that AEW dissolved on March 21, 2006, and did not assign the Mark. (Id. at 31, 33.)   Zinn/Excalibur also assert that Seruga has admitted in e-mails that she has written that she is not the owner of the Mark, and that AEW in fact owns it.  (Id.)  Zinn/Excalibur argue that F. Aeschbach AG dissolved in 1998, and therefore could not have assigned the Mark to Seruga in either 2003, 2004, or 2006.  (Id. at 32.)

Zinn/Excalibur also argue that the '276 registration has been abandoned, and that as such, it was not nor could it have been assigned.  (Id.)  In support of this argument, Zinn/Excalibur again assert that AEW dissolved on March 21, 2006, and that the company did not exercise any supervision of the Mark.   (Id. at 33.) Zinn/Excalibur claim that F. Aeschbach AG also did not exercise quality control over the Mark at any time between 1977 and 1989 when ARTOFEX products were manufactured by Zinn at Excelsior.  Zinn/Excalibur assert that neither Artofex AG nor AEW exercised quality control efforts when each respectively owned the Mark.  (Id.)  Moreover, Zinn/Excalibur argue that F. Aeschbach AG, in the assignment in 2003 to Seruga, did not include the Mark's goodwill.  (Id.)  Zinn/Excalibur also maintain that in consideration of the reality of the

transaction memorialized in the 2006 Nunc Pro Tunc assignment, that the goodwill was also not transferred at that time. (Id. at 34.) Therefore, Zinn/Excalibur argue that originally F. Aeschbach AG transferred the Mark with the goodwill to Artofex AG in 1989, and that it transferred its assets and inventory to Kolb in 1989, reserving the Mark for Artofex AG, and it therefore follows that Artofex AG transferred the Mark to AEW in 1995 with goodwill.

Zinn/Excalibur also assert that they had the right to make ARTOFEX products pursuant to the Corporate Settlement Agreement ("CSA"), which was signed in 1997, and that the 2003 assignment of the Mark was a sham. Plaintiffs assert that the Mark was abandoned by AEW because the company dissolved on March 21, 2006, and it has not used the Mark for three years. (Id. at 35.)

Zinn/Excalibur state that "[t]his case should have ended with Seruga's fabricated Translation Statement, Nunc Pro Tunc Assignment and Declaration filed with the USPTO in 2006 attempting to rewrite the ownership history of the '276 Artofex mark" and that "Defendant Seruga's position assumes that she owns the mark" but does not prove it. (Docket Entry No. 164 at 4.) Zinn/Excalibur urge the Court to conclude that because the Mark was never validly assigned to Defendant Seruga, and because the Mark has been abandoned, that the '276 Mark is not incontestable. (Id. at 40.) Zinn/Excalibur also assert that no court has ever before held that the Mark is incontestable. (Id.) Therefore, Zinn/Excalibur argue that Seruga/Excellent cannot benefit from an argument that the Mark is incontestable because the assignment of the Mark is invalid. (Id.) Further, even if the Mark is incontestable, Zinn/Excalibur argue that they still challenge Seruga/Excellent's alleged rights to the Mark based on Seruga's fraudulent registration, the abandonment of the Artofex name, and based upon the equitable principles of laches, estoppel, unclean hands, and pursuant to the terms of the CSA.

12

Zinn/Excalibur argue that Defendant Seruga admitted in e-mails which she wrote that AEW, located in Enfield, England, actually owned the '276 Mark in 2005, and that the Court should find that her testimony regarding these e-mails and their alleged meaning lacks credibility.  (Id. at 42.) Zinn/Excalibur argue that upon such a finding, the Court should conclude that Seruga/Excellent's trademark infringement claim, which was filed on December 22, 2006, was filed in bad faith.  (Id.) Zinn/Excalibur  maintain that it therefore follows that the '038 registration is also void based upon false representation.  (Id.)

In response to these arguments, Seruga/Excellent maintain that "ARTOFEX is perceived as a trademark" in the United States, and is "not an abandoned term that has been genericized by 'widespread' third party use." (Docket Entry No. 163 at 73 to 74.)  Further, Seruga/Excellent state that there is no evidence that the Mark has been abandoned.  (Id. at 74.)  Seruga/Excellent point out that Zinn/Excalibur have to meet a high burden of proof to show abandonment, and they have failed to meet that burden.  (Id. at 75 to 77.)  Seruga/Excellent also point directly to Zinn's testimony where he stated that ARTOFEX is "a type of mixer . . . . it's just a general term . . . like you would call a car a Ford car." ((Id. at 76) (citing 11/21/08 Tr. 96:13-18).)  Because Seruga/Excellent assert that they have shown that the Mark is valid, and because Zinn/Excalibur have failed to rebut that presumption, Seruga/Excellent argue that the Court should find in their favor.  (Id. at 77 to 78.)

Seruga/Excellent offer their own version of assignment history.  (Docket Entry No. 166 at 9.)  They argue that Mr. Wampfler, the owner of F. Aeschbach, assigned the Mark to Artofex AG, but that the Mark reverted back to F. Aeschbach when Artofex AG dissolved and merged all of its assets and liabilities with F. Aeschbach, and subsequently, F. Aeschbach, which is still in existence to this day, assigned the Mark to Seruga in 2003.  (Id. at 9 to 10.)

Further, Seruga/Excellent argue that this Court previously held that "the mistakes in preparing and recording assignments with regard to the ARTOFEX mark did not amount to fraud as a matter of law." (Docket Entry No. 163 at 80.) Seruga/Excellent maintain that "the assignment of the '276 registration has been recorded and acknowledged by the PTO" and "[s]uch recording and acknowledgment is prima facie evidence of the execution of the assignment" pursuant to 15 U.S.C. §1060. (Id. at 80.) Seruga/Excellent further point out that Zinn/Excalibur stated "in Count IV that ownership of the Mark lies with Artofex AG" but they "failed to substantiate that claim or to counter Mr. Wampfler's Declaration which explained that the dissolution and subsequent merger with F. Aeschbach caused ownership of Artofex AG's assets, including the ARTOFEX mark, to revert to F. Aeschbach." (Id. at 80.)

 Seruga/Excellent also address the Swiss Commercial Register documents that were produced by Zinn/Excalibur at trial, and state that they are incomplete, but explain that where the documents show that F. Aeschbach was no longer registered in a particular canton or county, it is because it had moved and incorporated in a different canton. (Id. at 82.) Seruga/Excellent assert that "the complete records show F. Aeschbach is still in business." (Id.) Seruga/Excellent also point out that "[u]nder U.S. trademark law, the owner of the trademark need not . . . be the manufacturer of the trademarked goods." (Id. at 83) (citation omitted). Seruga/Excellent argue that it therefore follows that the Court should find that "it is irrelevant that F. Aeschbach's register entry in Aarau was deleted on May 26, 1998, and this part of F. Aeschbach's business was in machinery factor and iron foundry" and that "F. Aeschbach's deletion from the Commercial Register in Aarau, Canton Aargau, does not preclude the company from continuing to exist or existing elsewhere." (Id.)

Seruga/Excellent also maintain that the omission of the word "goodwill" in the assignments

14

is without consequence because "Ms. Seruga's and Mr. Kaeser's testimony corroborate the circumstances of Mr. Wampfler's declaration." (<u>Id.</u> at 80 to 81.) Further, Seruga/Excellent urge the Court to "look to the circumstances surrounding the assignment to determine if goodwill actually passed." (<u>Id.</u> at 84) (citations omitted).   Specifically, Seruga/Excellent describe how "Seruga worked with . . . F. Aeschbach and the licensees and received training from the Swiss manufacturer in how to manufacture ARTOFEX parts and equipment," how "[t]he parts produced the United States were always inspected for quality," and how "consumers knew they could look to [Defendants] for repairs and replacement parts," and these circumstances "epitomize[] the transfer of goodwill." (<u>Id.</u> at 85.)

In further response to Zinn/Excalibur's argument, Seruga/Excellent state that "Mr. Wampfler, who at one point owned AEW, was the director of Artofex AG at that time and had knowledge of the transactions, and explained that the assignment was in error [and] Plaintiffs have simply failed to proffer any evidence contrary to Mr. Wampfler's explanation regarding the ownership and assignment of the trademark." (<u>Id.</u> at 86.)

In addressing Zinn/Excalibur's argument that Defendant Seruga authored e-mails in which she admitted that she did not own the Mark, Seruga/Excellent argue that it is the belief at the time the application was filed that is relevant, and these e-mails were sent two years after that application was signed. (<u>Id.</u> at 92.) Therefore, Seruga/Excellent argue that "this [e-mail] has no relevance as to Mr. Zinn's rights under the Agreement and the only remaining fraud count." (<u>Id.</u>) Seruga/Excellent argue that even if the Court finds the e-mail relevant, it only "shows that Ms. Seruga, a layperson not a lawyer, was trying to investigate the assignment records and resolve a problem at the PTO; it had no bearing on Ms. Seruga's belief, as confirmed by her testimony." (<u>Id.</u>

at 92.)  Further, in context, the response that Ms. Seruga received from Mr. Wampfler stated, "Please check whether the ARTOFEX trademark that was transferred to you at the time is the same as the one that was transferred previously to Artofex Enfield?"  (Id.) (citation omitted).  This exchange, Seruga/Excellent argue, actually corroborates the statement that Mr. Wampfler later filed with the USPTO.  (Id. at 92 to 93) (citing DX3A).  Seruga/Excellent also point out that Zinn/Excalibur chose not to depose Mr. Wampfler, and therefore, chose not "to get to the truth of [e-mail] correspondence."  (Id.)

### 2.    Zinn/Excalibur's Asserted Affirmative Defenses

Zinn/Excalibur urge the Court to deny relief sought by Seruga/Excellent due to their unclean hands, stating that Seruga admitted in e-mails in 2005 that AEW, not F. Aeschbach AG, owned the Mark and nevertheless brought counterclaims against Plaintiff for trademark infringement.  (Docket Entry No. 161 at 36.)  Zinn/Excalibur also argue that Seruga has unclean hands because she had possession of the Swiss Registry documents that indicated that Artofex AG dissolved in 1994 and that F. Aeschbach dissolved in 1998, but nevertheless claimed that the '276 Mark was conveyed to her in 2003, 2004, and 2006.  Zinn/Excalibur urge the Court to conclude that Seruga/Excellent have unclean hands that should preclude relief because Seruga violated the CSA and disparaged Zinn/Excalibur's products on her website and to customers.  (Id.)

Zinn/Excalibur argue that the Court should conclude that, pursuant to principles of collateral estoppel, Seruga/Excellent's Claims One through Four should be dismissed, due to decisions that were made in the 2002 State action.  Specifically, Zinn/Excalibur argue that Claims One through Four of the 2004 State action, which were consolidated with this federal action, mirror Claims One,

16

Two, Three, and Six of the 2002 State action.  (<u>Id.</u> at 37.)  Zinn/Excalibur argue that the issues adjudicated in the 2002 State action included "use of the former Excelsior telephone number, advertising as a successor to Excelsior, informing potential customers that Defendants were not in the bakery equipment industry, diverting Defendants' revenue and advertising that plaintiffs were the exclusive manufacturers and representatives of Artofex equipment."  (<u>Id.</u>)  In particular, Zinn/Excalibur reference the April 16, 2003 Order, which they assert resolved these issues, and they also assert that the remaining disputed causes of action were dismissed in the State action in 2004.  (<u>Id.</u>)

Zinn/Excalibur argue that "Defendants are guilty of laches" because they did not sue Zinn/Excalibur until December 22, 2006, eleven years after Seruga/Excellent claim that Zinn/Excalibur used the Mark.  (<u>Id.</u> at 41.)   Further, Zinn/Excalibur state that they "relied on Defendants' inaction and the inaction of Artofex AG and AEW and believed that their conduct was consistent with the CSA and the 2003 Court Order in the 2002 State action."  (<u>Id.</u> at 42.)  Plaintiffs also assert that the Statute of Limitations bars the litigation of claims that originated in 1995.  (<u>Id.</u>)

Zinn/Excalibur argue that the Court should hold that June 7, 2006 Nunc Pro Tunc Assignment did not confer retroactive standing, and because the instant Declaratory Judgment action was instituted on July 18, 2005, Seruga/Excellent could not have brought the counterclaims on December 22, 2006.  (<u>Id.</u> at 39.)

### 3.    Seruga/Excellent's Claim that Zinn/Excalibur are Liable for Engaging in Acts of Unfair Competition and Counterfeiting

Seruga/Excellent argue that these same considerations regarding the infringement claim are

applicable to the conclusion that Zinn/Excalibur should be held liable for unfair competition and counterfeiting. Seruga/Excellent argue that the Court should conclude that "Plaintiffs have infringed the registered Mark, and that such infringement was intentional and with full knowledge that ARTOFEX was a trademark" and as such, liability for unfair competition and counterfeiting has been proven. (Docket Entry No. 163 at 63.) Seruga/Excellent assert that Zinn told inquirers that Seruga was dead or that ARTOFEX was out of business when asked about them, and that Zinn advertised with the slogans: "Excellent is not good enough. If you want the best come to EXCALIBUR" and "if you want equipment better than just excellent you want Excalibur." (Id. at 64.) Seruga/Excellent also argue that the products that Zinn/Excalibur manufactured had identical or nearly identical specifications as authentic ARTOFEX products, and that Zinn/Excalibur supplied these products to customers who wanted ARTOFEX products. (Id.) Seruga/Excellent assert that such use, alone, constitutes unfair competition, and that the other evidence, including "Plaintiff's deceptive advertisements, use of the Excelsior phone number, and use of the copied ARTOFEX molds further reveal Plaintiffs' goal of deceiving customers." (Id.) Seruga/Excellent maintain that therefore, this Court should grant judgment in their favor as to Counts III, V, and VI of the federal action and as to Counts IV, V, and VI of the consolidated state action.

Zinn/Excalibur again counter-argue that the Court should conclude that they are not liable for counterfeiting a federal trademark because Seruga is not the valid owner of the Mark, because the Mark is not valid, and because there is not a likelihood of confusion. (Docket Entry No. 161 at 47.) Further, Zinn/Excalibur argue that their use of the Mark was consistent with the CSA and with the 2003 Court Order. (Id.)

    **4.**    **Seruga/Excellent's Claim that Zinn/Excalibur are Liable for Unlawful Cybersquatting**

Seruga/Excellent maintain that Zinn has admitted that the company Artofex Machine LLC, a company registered by Plaintiffs, is the listed owner of the domain name "www.artofex-usa.com," and that because Zinn/Excalibur, in bad faith, intended to profit from the Mark and registered this confusingly similar domain name to the Mark, Zinn/Excalibur are liable for cybersquatting. (Docket Entry No. 163 at 65.) Seruga/Excellent argue that based upon this Court's consideration of the factors enumerated in 15 U.S.C. §1125(c)(1), this Court should conclude that the ARTOFEX Mark is distinctive. (Id. at 65.)

Zinn/Excalibur respond that the Court should find that they are not liable for cybersquatting because Seruga/Excellent do not own the Mark, that it has been abandoned, and that therefore, they cannot be liable because it "no longer possesses the distinctive quality of a trademark, which is required for a cybersquatting claim." (Docket Entry No. 161 at 43.) Further, Zinn/Excalibur argue that there was no bad faith intent to profit from the Mark when they registered the domain name "http://www.artofex-usa.com," and pursuant to the factors enumerated in 15 U.S.C. §1125(d)(a)(A), the Court should find that there was no bad faith with intent to profit. (Id.) In particular, Zinn/Excalibur assert that the CSA and the 2003 Court Order show that Plaintiffs had rights in the Mark, satisfying Factor I; that Zinn, previously operating as R&K Zinn Corp., had used the Mark, satisfying Factor III; that Zinn/Excalibur's website "http://www.artofex-usa.com," was never accessible, satisfying Factor IV; that no product or service related to the Mark was ever offered on the website and that they never "posted any comments about the [M]ark, rendering it impossible to harm the alleged goodwill represented by the Mark," satisfying Factor V; that Zinn/Excalibur have

not tried to sell the domain name, satisfying Factor VI; that false contact information was not provided when Zinn/Excalibur registered for the domain name, satisfying Factor VII; and that Zinn/Excalibur have not registered other similar domain names, satisfying Factor VIII.  (Id. at 43 to 44.) Zinn/Excalibur also argue that as a matter of law, registering the domain name is not a violation of the Anti-cybersquatting Consumer Protection Act ("ACPA") because the Act's purpose is to prevent "the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark."  ((Id. at 44) (citation omitted).)   In addition, Zinn/Excalibur maintain that they reasonably believed that the ACPA's "safe harbor" provision applied.  (Id.)


### 5.      Seruga/Excellent's Claim that Zinn/Excalibur are Liable for having Diluted the ARTOFEX Mark

Seruga/Excellent aver that Zinn/Excalibur's actions have diluted the Mark pursuant to 15 U.S.C. §1125(c) and N.J.S.A. § 56:3-13.20.  (Docket Entry No. 163 at 67.) Seruga/Excellent assert that the Mark is famous, that it has been in use since at least 1911, that users of the products include large and small bakeries, and the Mark is advertised regularly in industry publications.  (Id. at 68 to 69.)  Seruga/Excellent also point out that "the word ARTOFEX has no other meaning than that of a trademark." (Id. at 69.)  Because Zinn/Excalibur have used the Mark, Seruga/Excellent argue that the ability of customers to identify the Mark and distinguish ARTOFEX products from others like it has decreased, which has likely caused damage to Seruga/Excellent. (Id.)

Zinn/Excalibur again respond that they are not liable for the dilution of the Mark because Seruga does not own the Mark, the Mark is invalid and abandoned, the Mark is not famous, and the

products sold using the Mark are obsolete.  (Docket Entry No. 161 at 45 to 46.)  Further, Zinn/Excalibur argue that when the parties jointly owned and operated R&K Zinn Corp. from 1977 to 1995, that they used the Mark.  (Id. at 46.)


### 6.    Seruga/Excellent's Claim that Zinn/Excalibur have Breached the CSA

Seruga/Excellent argue that under New Jersey law, Zinn/Excalibur have breached and continue to breach the CSA that the parties reached when they dissolved their joint business. (Docket Entry No. 163 at 69.)  Specifically, Seruga/Excellent provide the following actions taken by Zinn/Excalibur that they argue have violated the agreement: (1) Zinn/Excalibur represented that they were "the successor to Excelsior and claim[ed] to be sales and service representatives for the ARTOFEX line of mixers in violation of clause 3(b) of the Agreement;" (2) Zinn/Excalibur used "the Excelsior phone number, which Zinn admitted was prohibited by the Agreement," in violation of clause 3(a) of the Agreement; (3) Zinn/Excalibur used "the ARTOFEX mark without permission from the owner or licensor . . . and thus such use is not 'true in fact' under clause 3(f)" of the Agreement; and (4) Zinn/Excalibur engaged in unfair competition with Defendants "by telling customers that ARTOFEX products are no longer available because Artofex is out of business, [and] that Seruga is dead" in violation of clauses 3(c) and 3(d) of the Agreement.  (Id. at 70.)

Zinn/Excalibur urge the Court to conclude that they are not liable for using Excelsior's former telephone number, (201)967-8222 ("the phone number"), between 1999 and 2003.  (Docket Entry No. 161 at 48.)  Zinn/Excalibur ask the Court to find that the phone number was deactivated in 1995 when the parties' former company, R&K Zinn Corp., dissolved and that in 1999, the phone company randomly assigned the phone number to Zinn/Excalibur "as a rollover number."  (Id.)

Zinn/Excalibur assert that they did not know that the number assigned to them was the same as the Excelsior phone number, and they maintain that they never advertised the phone number. (Id.) Zinn/Excalibur also point out that they deactivated the phone number in 2003, pursuant to Judge Escala's Order, and they never used the phone number again. (Id.) In further defense to Seruga/Excellent claims regarding the phone number, Zinn/Excalibur assert that Sergua/Excellent are collaterally estopped from relitigation of this issue because the 2002 State action addressed it, resulting in an injunction and an award of no damages. (Id. at 49.) Zinn/Excalibur state that Judge Escala determined at that time that Seruga/Excellent were not able to prove damages. (Id.)

### 7. Seruga/Excellent's Claim that Zinn/Excalibur Have Tortiously Interfered with their Prospective Business Advantage

Seruga/Excellent argue that Zinn/Excalibur have tortiously interfered with Seruga/Excellent's prospective business advantage by "making malicious statements about ARTOFEX and Ms. Seruga," and by "improperly using the ARTOFEX mark and Excelsior phone number." (Docket Entry No. 163 at 71 to 72.)

Zinn/Excalibur do not directly address this claim, but do argue generally that "Defendants [sic] other claims fail with Defendants [sic] infringement claim." (Docket Entry No. 164 t 17.)

### 8. Seruga/Excellent's Claim that they should Prevail on State Fraud Allegations

Seruga/Excellent maintain that they should prevail on their common law fraud claim because Zinn breached the CSA, because the Court should find that Zinn conceived "this well-thought out scheme of deceit and diversion at least as early as 1995 when he wrote to Kolb," and because the

Court should find that Zinn's actions at a trade show in Las Vegas "with brochures stating Excalibur was the successor of Excelsior" under the circumstances constitute fraud.  ((Docket Entry No. 163 at 72.)  Seruga/Excellent assert that these actions prove that "Zinn had no intention of honoring the terms of any agreement, and that he falsely represented his position in negotiating and signing the Settlement Agreement."  (Id.)  Therefore, Seruga/Excellent aver that the Court should grant judgment in their favor in regard to Count II of the state action.

On the other hand, Zinn/Excalibur urge the Court to conclude that the April 24, 1997 CSA allowed them to use the ARTOFEX name and compete with Seruga.  (Docket Entry No. 161 at 35.)  Zinn/Excalibur also argue that the CSA provided for the release of any prior claims that the parties may have had against each other, that the parties are still bound by the CSA, and that Seruga/Excellent have violated the CSA "by interfering with Zinn's business by disparaging Zinn and his products and by objecting to his justifiable use of the Artofex name."  (Id.)

### 9.    Zinn/Excalibur's Claims regarding the Invalidity of the '038 Mark

Zinn/Excalibur urge the Court to conclude that '038 Mark is invalid because it was procured by falsely representing that the '276 Mark was of common ownership, and accordingly was able to otherwise overcome the USPTO's rejection of the application.  Zinn/Excalibur assert that the fraudulent procurement of a registration results in that registration being void.  (Id. at 38.)  Zinn/Excalibur also request that the Court conclude that Seruga/Excellent made false representations to the USPTO regarding her ownership of the '276 Mark, when Seruga knew that Zinn had rights to the Mark under the CSA and that AEW actually owned the Mark.  (Id. at 38 to 39.)

**10.    Zinn/Excalibur Maintain that they are not Liable for Registrations of Companies**

Zinn/Excalibur argue that the Court should conclude that they are not liable for registering the companies Artofex Machine Inc. or Artofex Machine LLC.  (Id. at 47.)  With respect to Artofex Machine Inc., Zinn/Excalibur state that they registered the company on August 16, 1995, the business was never active, and the registration was revoked on March 16, 1998.   (Id.) Zinn/Excalibur maintain that this ownership was transient, that there is no evidence of damages related to it, that Seruga/Excellent never owned the Mark, and that all claims that arose prior to April 24, 1997, were released pursuant to the CSA. (Id.)  Further, in regard to Artofex Machine LLC, Zinn/Excalibur registered the company on December 3, 1999,  the last annual report for the company was filed on October 16, 2002, and the State revoked the registration on July 16, 2006.  (Id.) Zinn/Excalibur assert that they "transacted no business as Artofex Machine LLC," and that the company under which he actually did business was Excalibur Bakery & Bagel Equipment, Inc., and the products that he sold were "Excalibur mixers" and used ARTOFEX mixers.   (Id.) Zinn/Excalibur continue to assert that despite the registration of Artofex Machine LLC, "the name Artofex was available to register and the Defendants had no trademark rights to object to the company registration."  (Id. at 48.)


**11.    Zinn/Excalibur's Claim that Seruga/Excellent Cannot Sue for Past Infringement**

Zinn/Excalibur urge the Court to find that Seruga/Excellent do not have the right to sue for past infringement of the Mark because even if Seruga was assigned the Mark, the 2003, 2004, and 2006 assignments of the '276 Mark to Seruga did not include such a right.  (Id. at 49.)

24

Zinn/Excalibur maintain that the Court should conclude that the law requires that "the right to sue and recover for past infringements must be expressly assigned and does not automatically pass with rights to the mark," and that the Court should find that these assignments did not expressly state assignment of that right. (Id.)

## 12. Seruga/Excellent Assert that Zinn/Excalibur's Fraud Claim Should Be Dismissed

Seruga/Excellent identify the one count of fraud that has not yet been dismissed by the Court, stating that "Mr. Zinn's apparent allegation that the Settlement Agreement gave him rights, and that it was fraudulent for Ms. Seruga to claim she is the owner of the mark when filing the trademark application." (Docket Entry No. 163 at 87 to 88.) Seruga/Excellent argue that the CSA could not give Zinn anything other than fair use of the trademark, which is available to all individuals under U.S. trademark law. (Id. at 88.) Seruga/Excellent note that Zinn, however, mistakenly believes that the CSA actually transferred rights to him to use the Mark. (Id.) Seruga/Excellent also point out that "Ms. Seruga paid $5,000 and has been using the Mark for 30 years" and that she has owned the Mark since early 2003. (Id.) Seruga/Excellent assert that Seruga believed that she was the owner of the ARTOFEX mark when he filed the application for its registration, and the licensees of the Mark and a previous Court also warned Zinn that he was not permitted to use the Mark. (Id. at 90.) Seruga/Excellent maintain that Zinn admitted that "he did not have permission from the owner of the Mark to use it." (Id. at 91.) Therefore, Seruga/Excellent argue that Zinn has not provided evidence that would clearly establish that he had rights in the Mark, and for these reasons, the fraud claim asserted against Seruga/Excellent should be dismissed. (Id.)

**13.     Seruga/Excellent Argue that Zinn/Excalibur Have Presented No Evidence of Damages for False Advertising**

Seruga/Excellent argue that Zinn/Excalibur have failed to provide evidence of damages in support of their false advertising claim and "have not shown any deception of the buying public in this case." (Id. at 95.) Seruga/Excellent point out that "the only customer that Zinn identified bought the goods from Excalibur anyway," and therefore, no damages were sustained.     (Id.) Seruga/Excellent emphasize that "Plaintiffs cannot expect the Court to impose liability when they wholly failed to even try to prove their claims."  (Id.)

**D.     ANALYSIS**

**1.     Findings of Fact[1]**

 The Court finds the following facts to be true, having presided over a trial in this matter on November 21, 14, 25, 26, 2008, and April 1, 2009; having listened to and examined the testimony of Frank Mauro, Richard Zinn, Karin Seruga, and experts Richard Lane and William Morrison, and having reviewed the deposition designations of Max Kaeser, Patrick Loranger, Brenda Sizemore, Joe Faro, and Philip Meinero, and all of the exhibits admitted into evidence.[2]

---

[1]     To the extent that any findings of fact might constitute conclusions of law, they are adopted as such.  Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[2]     After trial concluded, the Court asked the parties to submit Findings of Fact and Conclusions of Law, and to agree upon those exhibits that were admitted at trial and those upon which the Court had yet to make a determination.  A number of disputes arose regarding the exact contents of certain exhibits or whether or not an exhibit was admitted at trial, and the Court now resolves these disputes.  The Court will rely upon the exhibits admitted on the record.

26

The Court finds that Mr. Zinn and Ms. Seruga, upon their divorce in 1997, entered into a CSA, which relevantly provided that they were not to "interfere with the other's activities in the conduct of the business of Excalibur and Excellent;" they would not "disparage, denigrate, or criticize the activities or business practices of the other in communications with customers, suppliers, prospects, or others associated with the industry;" they would not "represent, state or imply, in any trade publication or otherwise, that they are offering for sale any equipment or parts manufactured by Artofex or by any licensor of the Artofex product or name unless said representations are true in fact;" that "each party shall be entitled to purchase, rehabilitate and sell Artofex equipment; and shall be entitled to make, advertise and sell parts (using the designation triple action mixer and or the designation PH15, PH20, PH30), which can be used with or substituted for original Artofex equipment;" and that should either party violate these provisions, the other is entitled to bring suit for enforcement and a Court shall be able to award attorneys' fees and costs.  (PX4.)

On April 16, 2003, as a result of an Order to Show Cause in New Jersey Superior Court, Chancery Division, Bergen County, Docket No. C-276-02, the Honorable Gerald C. Escala, J.S.C. ordered that Zinn/Excalibur were barred from using the old Excelsior phone number pursuant to the CSA; that Zinn/Excalibur had seven days in which to disconnect the phone number or face sanction of $500.00 per day; that Zinn/Excalibur had to "keep a ledger of all new customers and . . . log the source of this business;" and that "[i]n the event that there are future violations of this Order regarding Seruga/Excellent's affiliation with or statements regarding the prior companies Banta and Excelsior" the Court will use the ledger to compute damages.  The Order to Show Cause also specifically stated that Zinn/Excalibur "are barred from stating, representing and/or advertising that they are 'an authorized representative' of Artofex, that they have or sale 'new' or 'original' Artofex

27

models and/or that they manufacture 'new' or 'original' Artofex models." (PX6; PX7.) At that time,

the only causes of action stated in the complaint were based upon breaches of the CSA. (PX5.)

However to the extent that Seruga/Excellent stated claims regarding Zinn/Excalibur's use of the

Marks, Seruga/Excellent stated in their complaint that because they were the "exclusive

representative of the Artofex product line in the Untied States," Zinn/Excalibur violated Section 3(f)

of the CSA when they "advertised and offered to sell Artofex products," and Seruga/Excellent as a

result, sought enjoinment of such activities, compensatory and punitive damages, and attorneys' fees

and costs. (PX5.) Judge Escala entered an Order of Dismissal on March 1, 2004, in that action.

(PX8.)

On April 2, 2004, Seruga/Excellent filed another action in New Jersey Superior Court, Law

Division, Bergen County, Docket No. L-6432-04, stating that Zinn/Excalibur continued to violate

the CSA, among other causes of action. (PX9.) Magistrate Judge Arleo signed a consent order on

January 27, 2007, (Docket Entry No. 30), consolidating that state action with the federal action that

Zinn/Excalibur had filed in this Court, Civil Action No. 05-3572, on July 18, 2005 (Docket Entry

No. 1).

Zinn and Seruga had each owned fifty percent of R&K Zinn Corp. d/b/a Excelsior and Banta,

and purchased the assets of Excelsior Industrial Corporation in 1977. Seruga traveled to Switzerland

in order to secure the exclusive distributorship of Artofex products in the United States. There, she

toured F. Aeschbach with Mr. Kaeser and Mr. Haller, employees of the company. She also secured

at that time the drawings and manuals associated with the Artofex line of products. Excelsior and

Banta dissolved on or about March 31, 1995, and the parties signed the CSA on April 24, 1997. The

terms of the CSA do not specifically address whether one party or the other or both would have

rights to exclusively distribute new ARTOFEX products going forward, but rather provided only that neither could represent that they had new ARTOFEX products for sale unless that statement was in fact true.

The Court finds that Seruga, on April 24, 1997, entered into an agreement, signed by Mr. Kaeser, in which she and Excellent Bakery became the exclusive distributors of ARTOFEX products in the United States.  The Court finds that one of the duties as the exclusive representative of ARTOFEX products in the United States was to defend the Mark in legal actions that arose.  (Kaeser Dep. 25:3-10; 11/24/08 Tr. 157:10-11.)

The Court finds that up to at least 1989, F. Aeschbach owned the '276 registration.  F. Aeschbach was owned at that time by Mr. Wampfler.  On May 24, 1989, F. Aeschbach assigned the '276 registration to Artofex AG.  There follows inconsistencies regarding the chain of ownership.  However, in observing Seruga during her testimony, the Court found her very credible.  The Court believes Seruga and finds that Mr. Wampfler, in his capacity as the individual owner of the Mark or as a representative of the Swiss company that owned the Mark, assigned the '276 registration to her on October 15, 2003.  (PX20.)[3]

Zinn/Excalibur have not submitted any credible, definitive, admissible evidence that Artofex AG did not dissolve in July 1989. However, Zinn/Excalibur have submitted several letters dated during 1990 and 1991, purportedly written on behalf of Artofex AG, to support the inference that it was still in existence.  Further, an agreement was signed between Artofex AG, F. Aeschbach, and

---

[3]     PX20 was admitted into evidence.  Zinn/Excalibur describe the exhibit as "all of the exhibits . . . in the patent and trademark office and filed on June 6, 2006," and Seruga/Excellent did not object to the admission of "the complete assignment records."  (4/8/09 Tr. 14:14-15:4.)

Kolb on August 27, 1990.  Mr. Wampfler is listed on that agreement as the corporate representative

for both Artofex AG and F. Aeschbach, and he is listed as the sole shareholder for Artofex AG.  Max

Kaeser illuminates what happened to Artofex AG when it dissolved, explaining that it went

bankrupt.  He stated in his deposition that "all the employees worked together until the 31st of

August, and then starting with the 1st of September we continued to work for Kolb in the departments

of Bako ARTOFEX."  (Kaeser Dep. 31:20-23.)  Therefore, the Court finds that the Request for

Correction of Assignment and Errors and Accompanying Declaration of Wampfler is credible and

fills in the disparities in these otherwise inconsistent documents.[4]

Wampfler filed the Request for Correction of Assignment with the USPTO, signed March

_____

[4]        The exhibit DX3A is the subject of a Motion in Limine. (Docket Entry No. 124.)
This exhibit is described as a certified copy of request for correction of assignment errors and
accompanying declaration.  Zinn/Excalibur argue that the exhibit should be excluded as hearsay
and has not been properly authenticated.  Seruga/Excellent counter-argue that it is admissible
either: (1) as a statement affecting an interest in property; (2) under the residual hearsay
exception; (3) because Zinn/Excalibur has adopted the declaration as true; (4) as a statement
against interest in the '276 registration; or (5) as non-hearsay regarding Seruga's belief that she
was assigned ownership of the ARTOFEX Mark.
        This agreement is not subject to the Federal Rules of Evidence that govern hearsay.  This
document is one of individual legal significance, memorializing a contract.  See Levy v. Carl
McGill & McGill Wellworks, Inc., 137 Fed. Appx 613, 616 n.12 (5th Cir. 2004)(recognizing that
"[s]igned instruments such as wills, contracts, and promissory notes are writings that have
independent legal significance, and are nonhearsay.'. . . The admission of a contract to prove the
operative fact of the contract's existence thus cannot be the subject of a valid hearsay objection.
To introduce a contract, a party need only authenticate it," (citing Kepner-Tregoe, Inc. v.
Leadership Software, Inc., 12 F.3d 527, 540 (5th Cir. 1994) (internal quotes omitted)).
        Here, through Seruga's testimony, this document has been authenticated.  Specifically,
she stated that in 2003 she purchased the ARTOFEX Mark from Mr. Wampfler, the owner of F.
Aeschbach AG who also owned the Mark.  (11/25/08 Tr. 42:14-24.) She spoke to Mr. Wampfler
over the telephone and offered $5,000.00 for the rights to the Mark, and he accepted.  She
produced proof of the $5,000.00 wire transfer.  Seruga testified that this agreement was
memorialized by her previous attorney, but that apparently, some mistakes had been made.
(11/25/08 Tr. 44:2-14.)  To fix these mistakes, her new attorney drafted DX3A, a request for
correction of assignment errors, which reflected the terms of her agreement with Mr. Wampfler.
(11/25/08 Tr. 46:3-15.) Therefore, Zinn/Excalibur's motion in limine is denied..

6, 2006, which states that any previous assignment of the ARTOFEX Mark was done in error; that in fact, the '276 registration had been assigned to Karin Seruga, including the goodwill, on October 15, 2003; and that F. Aeschbach had ownership of the Mark at that time.  (DX3A.)[5]  While the Court notes that this document was filed after the instant litigation had already been instituted, the Court nevertheless finds that it comports with the credible testimony of Defendant Seruga, and explains many of the inconsistencies in the documents.  The Court also finds that Seruga, via a wire transfer, paid Mr. Wampfler $5,000.00 for the Mark.  (DX532.)

The Court observed and evaluated Zinn's testimony at trial.  He was somewhat evasive and argumentative in responding to questions, and the Court found him to be less credible than Seruga. The Court finds that Zinn/Excalibur have been using the identical trademark ARTOFEX in their advertising in Modern Baking Magazine, (Sizemore Dep. Exs. 186, 187, 188, 189, 190, 196, 199); that they have sold products using the Mark for their products, (11/21/08 Tr. 135:12-14); that they have registered the tradename Artofex Machine LLC and used that tradename on invoices, (DX212; DX325; Dx15; 11/21/08 Tr. 144:17-19); that they have issued price quotations to prospective customers for new ARTOFEX products and have entertained requests for ARTOFEX products, (11/21/08 Tr. 213:22-218:9); that they have provided "PH" parts and led customers to believe that they are genuine ARTOFEX parts, (11/21/08 Tr. 163:2-4); that they used the word "Artofex" in the metatags of the page on their website for new ARTOFEX products, (DX164; 11/21/08 Tr. 210:25-211:13); that they have used the word "Artoflex" in reference to products that

---

[5]    In respect to DX525, the Court concludes that no hearsay exception applies, and that Seruga's understanding regarding the "cross-outs" on DX3A is irrelevant.  That document, DX3A, speaks for itself.  Therefore, DX525 is not admitted into evidence.

they sold, (Sizemore Dep. Ex.197); and that their website and materials make use of the product name "ART OF EXcalibur" triple action mixer, (DX329; 11/21/08 Tr. 209:17-210:21).

The Court finds that the parties are competitors and use the same trade channels and means to market and advertise their goods and services. The Court also finds that Zinn/Excalibur registered the domain name "www.artofex-usa.com" under their tradename Artofex Machine LLC. (11/21/08 Tr. 159:14-16.)

Regarding the parties' customers, the Court has reviewed the depositions and the many documents in evidence. The Court finds that the customer Bud Foods, represented by Patrick Loranger, had been under the impression that the company Excelsior had changed its name to Excalibur. (Loranger Dep. 27:24-28:21.) The owner of Joseph's Gourmet Pasta and Sauces, Joe Faro, stated that he recently contacted Excalibur to buy three mixers, but that he also considered purchasing from Excellent. (Faro Dep. 14:19-23; 18:8-19:10.) In addition, Faro stated that Excalibur did not represent to him that he was purchasing an ARTOFEX product, and in fact made it clear to him that the products were not ARTOFEX products. (Faro Dep. 22:12-19.) The Court reviewed the deposition of Philip Meinero of Entenmann's Inc., who stated that he believed that Excalibur mixers and ARTOFEX mixers are the same. (Meinero Dep. 15:12-15.) The Court also took note of the e-mail sent to Excellent from an employee at Busken Bakery for a part for a particular model, and that Artofex, in Switzerland, apparently referenced the customer to Excellent. (DX333.)[6]

---

[6]   Seruga/Excellent have included DX333 in their binder of reserved exhibits, which they submitted to the Court with their Proposed Findings of Fact and Conclusions of Law. Zinn/Excalibur have not objected to its inclusion.
   Although this exhibit has been included in those that Seruga/Excellent assert the Court reserved upon, and for which Seruga/Excellent request the Court's determination, the Court notes

2. **Conclusions of Law**

a. **Whether the Marks are Valid**

The Court concludes that Zinn/Excalibur failed to prove that Seruga does not own the ARTOFEX mark. Seruga/Excellent have carried their burden of proof, under the law, to show that the Marks are valid and owned by Seruga. Further, the Court holds that Zinn/Excalibur likewise have failed to prove that the Mark has been abandoned.

i. Whether the Assignment of the '276 Registration is Valid

The statute provides that "[t]o the extent that the right to use the registered mark has become incontestable . . . the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. §1115(b). Where ownership is contested, and there is "no documentary evidence of an assignment, it may be proven by the clear and uncontradicted oral testimony of a person in a position to have actual knowledge," and where there is unclear documentation, "strong evidence to establish an assignment is appropriate both to prevent parties from using self-serving testimony to gain ownership of trademarks and to give parties incentive to identify expressly the ownership of the marks they employ." Doeblers Pa. Hybrids, Inc. v. Doebler, 44 F.3d 812, 822 (3d Cir. 2006)(citations and internal quotes omitted).

_____

that at no time at trial did Seruga/Excellent ever actually offer it into evidence. At trial, defense counsel asked the Court to mark the exhibit as Seruga/Excellent's Exhibit 333, and then proceeded to ask Seruga to identify the document. (11/25/08 Tr. 67:17.) Then, Seruga paraphrased the contents of the two e-mails for the Court. Further, parts of the e-mails were read verbatim without objection. Defense counsel moved to a different line of questioning without moving the document into evidence.

The Court concludes that because the e-mail was paraphrased and substantially read by a witness on the record, without objection from Zinn/Excalibur's attorney, the document will be admitted into evidence, despite the absence of a formal request.

"A trademark may be transferred or assigned only with the transfer of the goodwill of a business, because a trademark has no significance independent of that goodwill." Colonial Elec. & Plumbing Supply of Hammonton, LLC v. Colonial Elec. Supply, Ltd., No. 05-5408, 2007 U.S. Dist. LEXIS 94417, at *14 (D.N.J. Dec. 27, 2007) (citing Premier Dental Prods. Co. v. Darby Dental Supply Co., 794 F.2d 850, 853 (3d Cir. 1986)). "A purported assignment of a trademark without goodwill is an invalid 'assignment in gross.'" Colonial Elec., 2007 U.S. Dist. LEXIS 94417, at *15 (citing interState Net Bank v. NETB@NK, Inc., 348 F. Supp. 2d 340, 348 (D.N.J. 2004)). "'Goodwill' is the advantage obtained from use of trademark. This includes public confidence in the quality of the product and in the warranties made on behalf of the product . . . by the public that differentiates that product from others." Colonial Elec., 2007 U.S. Dist. LEXIS 94417, at *15 n.9 (citation omitted).

"'The transfer of a trade name to a subsequent entity is presumed in the absence of evidence to the contrary.'" Id. at *15 (citing Mid-List Press v. Nora, 275 F. Supp. 2d 997, 1002 (D. Minn. 2003)). "Formal assignments of trade names are not required, because 'the law presumes that when a business is conveyed, its tradename and goodwill are also conveyed.'" Colonial Elec., 2007 U.S. Dist. LEXIS 94417, at *16 (citing Am. Sleek Craft, Inc. v. Nescher, 131 B.R. 991, 996 (D. Ariz. 1991)). "Courts, however, 'must be cautious in scenarios that do not involve clear written documents of assignment.'" Colonial Elec., 2007 U.S. Dist. LEXIS 94417, at *16 (citing Doeblers' Penn. Hybrids, Inc. v. Doebler, 442 F.3d 812, 822 (3d Cir. 2006)).

The Court concludes that Seruga has been assigned the '276 registration and is the current owner within the United States. First, the parties agree that Zinn and Seruga each owned fifty percent of their previous business, R & K Zinn Corp., d/b/a Excelsior and Banta. They purchased

the assets of Excelsior Industrial Corporation, and became the exclusive distributor in the United States of new ARTOFEX products in 1977.  Further, the Court has found that in order to secure purchase of the business and to become the exclusive distributor of new ARTOFEX products in the United States, Seruga traveled to Switzerland and toured F. Aeschbach with Max Kaeser and Mr. Haller, employees of the company.  It was at that time that Seruga secured for Excelsior's benefit, the drawings and manuals associated with the ARTOFEX line of products.  During the time that the parties jointly owned and operated Excelsior, they ordered products from Switzerland, and sometimes their company Banta, which was primarily operated by Zinn, made parts according to the drawings that Seruga received during her initial trip to Switzerland.  Excelsior was dissolved on or about March 31, 1995, and the parties signed a Settlement Agreement on April 24, 1997, in which they equally distributed the assets of Excelsior.  The terms of the CSA do not specifically address whether one party or the other or both would have rights to exclusively distribute new ARTOFEX products in the future, but rather, provided only that neither could represent that they had new ARTOFEX products for sale unless that statement was in fact true.

Whether assignments of the '276 registration are valid is central to this Court's inquiry. Here, there is unclear documentation of assignment history, and therefore "strong evidence" of ownership is necessary.  See Doeblers Pa. Hybrids, Inc. v. Doebler, 44 F.3d at 822.  The Colonial Electric court concluded that "[t]he transfer of a trade name to a subsequent entity is presumed in the absence of evidence to the contrary."  Colonial Elec., 2007 U.S. Dist. LEXIS 94417, at *15 (citing Mid-List Press v. Nora, 275 F. Supp. 2d at 1002).  The Court concludes that Zinn/Excalibur have not shown that the assignments of the '276 registration are invalid, and the Court concludes that Seruga/Excellent have provided "strong evidence" to show that Seruga owns the Mark. Specifically,

35

this Court finds that until 1989, the '276 registration was owned by F. Aeschbach.  That company was owned by Fritz Aeschbach and then was later owned by Ulrich Wampfler.  According to the record, F. Aeschbach properly assigned the '276 registration to Artofex AG on May 24, 1989.  The parties agree that this assignment occurred.

However, it is after May 24, 1989, that the documentation of assignments becomes unclear.  The Request for Correction of Assignment Errors and Accompanying Declaration of Wampfler states that in July 1989, Artofex AG dissolved. (DX3A; PX20.)  Zinn/Excalibur have not submitted credible, definitive, admissible evidence that Artofex AG did not dissolve on this date.[7]  The

_____

[7]    Zinn/Excalibur sought admission of PX56, a certified copy from the Handelregister des Kantons Aargau and its certified translation.  Zinn/Excalibur argue that this document proves that "Artofex AG  was cancelled on July 14, 1994 and [that] consequently, there was no dissolution in 1989 or reversion of trademark rights to F. Aeschbach."  (Docket Entry No. 159 at 1.)  Seruga/Excellent object to the admission of this certified translation of a Swiss Commercial Register document, arguing that it "was not produced during discovery" and that Zinn/Excalibur withdrew this document from their exhibit list during a pre-trial hearing and should not be permitted to try to add it again at this late hour.  Central to this analysis is Zinn/Excalibur's claim that certain portions of the document that Seruga/Excellent provided to the USPTO and then to Zinn/Excalibur in discovery were "blacked out" and were illegible.

Federal Rule of Procedure 44(a)(2) provides the means of proving an official foreign record.  Fed. R. Civ. P. 44(a)(2).  It provides in pertinent part that "an official publication of the record" is admissible, or "the record – or a copy – that is attested by an authorized person and is accompanied either by a final certification of genuineness or by a certification under a treaty or convention to which the United States and the country where the record is located are parties" is admissible.  Further, in areas of substantive foreign law, an expert witness appropriately explains the nuances.  See 9 Moore's Federal Practice §44.04 (2009).

Here, Zinn/Excalibur attempted to move this document into evidence on the last day of trial without previously introducing it in Court, but prior to the close of evidence, and did so without requesting or producing expert testimony to explain the substantive foreign laws that are relevant to understanding this foreign document.  Accordingly, contrary to Rule 44(a)(2), Zinn/Excalibur failed to produce "an authorized person" to authenticate the translation statement and foreign document, and failed to provide expert testimony regarding its significance and the significance of any such dissolution of Artofex AG in one particular county in Switzerland and the relation of any such dissolution of the company there to the existence of the company elsewhere.  Even if the Court were to conclude that there is no prejudice due to the late production, and that it was properly authenticated, the document's evidentiary worth is slight

36

evidence shows that there were some errors or inconsistencies within the official records regarding ownership of the Mark and regarding whether in fact Artofex AG was still operating after July 5, 1989. (DX3A.)  Specifically, Zinn/Excalibur have provided the Court with several letters dated during 1990 and 1991 purportedly written on behalf of Artofex AG. (PX28.)  Further, an agreement between Artofex AG, F. Aeschbach, and Kolb was signed on August 27, 1990, and it became effective on September 1, 1990. (PX13.)  The Court notes that Mr. Wampfler is the listed corporate representative for both Artofex AG and F. Aeschbach and that Mr. Wampfler was the sole shareholder of Artofex AG.  (Id.)  This agreement memorializes a sale of goods and equipment from Artofex AG to Kolb. (PX13.)  It also mentions another company, AEW, which the agreement states would still be permitted to provide ARTOFEX goods to customers in the United States.  (Id.)

The Court therefore is unable to conclude that in fact Artofex AG legally dissolved in 1989. Max Kaeser, who was an employee of all these companies at some point, including F. Aeschbach and Kolb among others, states that Mr. Wampfler had licensed the Mark to entities in various countries for its use and distribution. (Kaeser Dep. 9:4-10:2; 16:4-17:17; 24:19-23.)  The Court also notes the statement made about Artofex AG by Mr. Kaeser, who said, "There was this small company ARTOFEX AG, which was in existence for one or two years . . . under the leadership of Mr. Luescher. . . .  And under the leadership of Mr. Luescher, this company went bankrupt.  And was then purchased again through Mr. Wampfler and Aeschbach AG.  And this company, which still had the name ARTOFEX transferred all the rights to Kolb." (Kaeser Dep. 27:4-11.)  The Court therefore finds that even if Artofex AG was technically in existence after 1989, Artofex AG had gone

_____

without the beneficial guidance of an expert witness in Swiss corporate law.  For these reasons, the Court will sustain Seruga/Excellent's objection and exclude this exhibit.

"bankrupt," and that "all the employees worked together until the 31st of August, and then starting with the 1st of September we continued to work under Kolb in the departments of Bako ARTOFEX." (Kaeser Dep. 31:20-23.)  Therefore, the Court finds that the confusion stems from the bankruptcy of the company and the subsequent consolidation and transfer of assets to Mr. Wampfler's companies and subsequent assignees.

Upon the bankruptcy of Artofex AG in or about July 1989, the Mark was transferred back to Mr. Wampfler's ownership.  (DX3A; PX20.)  Mr. Wampfler is the listed corporate representative for both Artofex AG and F. Aeschbach, and he was the sole shareholder of Artofex AG.(DX3A; PX13; PX20; Kaeser Dep. 49:20-50:3.)  Therefore, it was within his power as a result of these positions that he held to subsequently assign the Mark to another owner.  Consistent with his pattern of business as it has been described for the Court, wherein he assigned or licensed the Mark to individuals for use in specific countries, Mr. Wampfler assigned the right of ownership of the '276 registration for its use in the United States to Seruga on October 15, 2003, and this assignment was recorded with the USPTO on October 17, 2003.  (PX20.)

The Court also concludes that the goodwill associated with the Mark was also transferred at that time.  The Court draws this conclusion based upon the wording of the assignment and the subsequent actions of the parties involved.  First, the October 15, 2003 letter from Mr. Wampfler states that he assigned the Mark to Seruga, and that "this assignment transfers to her all the rights, title and interest in said trademark which is registered with the United States Trademark Office, in the United States and anywhere else in the world to said trademark."  (PX20.)  Seruga paid $5,000.00 for the Mark, and the Court has reviewed the wire transfer for that amount that was transferred to F. Aeschbach AG and Mr. Wampfler on October 14, 2003.  (DX532.)  Neither party

38

has presented any other evidence otherwise explaining the reason for this wire transfer.

The Court therefore finds credible the document later submitted to the USPTO by Mr. Wampfler as it is substantially confirmed by the other evidence, and in which Mr. Wampfler explains that an error was made in respect to the Mark. (DX3A.)  Mr. Wampfler explains that "the previous assignment from Artofex AG to [AEW] . . . identified the wrong trademark and was improperly prepared.  The identification of U.S. Registration No. 231,276 in the Assignment to [AEW] was an error."  (DX3A.) Mr. Wampfler also explains that the error was caused in that AEW was a licensee of the Mark and that "it obtained no rights of ownership in the United States."  Mr. Wampfler states that due to these errors, the purported assignment to AEW "was null and void," and that subsequently, Seruga "entered into an agreement with F. Aeschbach AG, the then owner of the U.S. Reg. 231,276, to assign all right, title and interest in the mark and registration, including the goodwill symbolized by the mark."  (DX3A.) Although the Court, as a result of these documents fails to understand whether Seruga owns the Mark outside of the United States, such determination is not relevant to the instant dispute.

The Court thus concludes that the assignment of the '276 registration to Seruga from Mr. Wampfler and F. Aeschbach AG is valid and that Karin Seruga owns the rights in the ARTOFEX Marks, at least, in the United States.

ii.    Whether the ARTOFEX Mark has been abandoned

Abandonment is provided for as well in the Lanham Act, which states that a mark is deemed abandoned:

(1)    When its use has been discontinued with intent not to resume such use.

39

Intent not to resume may be inferred from circumstances.  Nonuse for 3 consecutive years shall be prima facie evidence of abandonment . . . [or]

(2)     When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark.

15 U.S.C. § 1127.  "To establish the defen[s]e of abandonment it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon."  United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 138 (3d Cir. 1981) (quoting Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 31 (1900)); see also PBI Perf. Prods. v. NorFab Corp., No. 05-4836, 2007 U.S. Dist. LEXIS 58689, at *8 (E.D. Pa. Aug. 3, 2007).  "Acts which unexplained would be sufficient to establish an abandonment may be answered by showing that there never was an intention to give up and relinquish the right claimed."  Philadelphia Jaycees, 639 F.2d at 138 (quoting Saxlehner, 179 U.S. at 31).

The Third Circuit has held that

[a] trademark license is typically written and contains express terms giving the licensor power to engage in quality control to ensure that the licensee does not engage in mere "naked" use of the mark.  Naked licensing is an "uncontrolled licensing of a mark whereby the licensee can place the mark on any quality or type of goods or services," raising "a grave danger that the public will be deceived by such usage."

Doeblers' Pa. Hybrids, Inc., 442 F.3d at 823 (citation omitted); see also Unicasa Mktg. Grp., LLC v. Martha Spinelli, No. 04-4173, 2007 U.S. Dist. LEXIS 16628, at *8 (D.N.J. Mar. 7, 2007).  "'The only effective way to protect the public where a trademark is used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees.'"  Doeblers' Pa. Hybrids, Inc., 442 F.3d at 823 (citing Dawn Donut Co. v. Hart's Food Stores, Inc., 267

40

F.2d 358, 367 (2d Cir. 1959)).  "Failure to provide quality control may constitute naked licensing, leading to abandonment of the mark."  Doeblers' Pa. Hybrids, Inc., 442 F.3d at 823 (citing Ditri v. Coldwell Banker Residential Affiliates, Inc., 954 F.2d 869, 873 (3d Cir. 1992)).

In applying this standard, the Court will be mindful of the fact that "abandonment, being in the nature of a forfeiture, must be strictly proved."  Philadelphia Jaycees, 639 F.2d at 139 (citing P.A.B. Produits et Appareils de Beaute v. Satinine Socita in Nome Collettivo di S.A.E M. Usellini, 570 F.2d 328, 332-33 (C.C.P.A. 1978)).  Indeed, "[e]vidence of abandonment must be clear and convincing."  American Olean Tile Co. v. American Marazzi Tile, Inc., No. 86-3089, 1988 U.S. Dist. LEXIS 11103, at (E.D. Pa. Oct. 5, 1988); Interstate Net Bank, 348 F. Supp. 2d at 348 (stating that abandonment must be established by clear and convincing evidence).

Given the Court's discussion regarding Seruga's ownership of the '276 registration, the Court thus concludes that the Mark has not been abandoned.  Zinn/Excalibur have not provided credible, clear and convincing evidence in support of their argument.

      iii.      Whether the Rights to the '038 Registration are Void Due to Fraudulent Procurement of the Registration

It is well established that "[f]raud in the securing and maintenance of the registration of a federal trademark 'constitutes a ground for the cancellation thereof within the purview of Section 14(c) [15 U.S.C. §1064].'"  Gen. Car & Truck Leasing Sys., Inc. v. Gen. Rent-A-Car, Inc., No. 88-6500, 1990 U.S. Dist. LEXIS 12749 (S.D. Fla. July 11, 1990).

Again, given the Court's discussion regarding Seruga's ownership of the '276 registration, the Court concludes that Seruga did not fraudulently procure the '038 registration.  She owns the

'276 registration and relied on that fact appropriately in her registration of the coined word ARTOFEX, as is reflected by the '038 registration.

### b.    Zinn/Excalibur's Affirmative Defenses

#### i.    Whether Defendants' Have Standing

Standing is an issue that the Court must address "even if the courts below have not passed on it, and even if the parties fail to raise the issue. . . . The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines." United States v. Hays, 515 U.S. 737, 742 (1995) (quoting FW/PBS, Inc. v. Dallas, 493 U.S. 215, 230-31 (1990)).  "Section 32 of the Lanham Act grants standing to assert a claim of trademark infringement to the 'registrant' of the mark" and "defines registrant as including the registrant and its 'legal representatives, predecessors, successors and assigns.'  Calvin Klein Jeanswear Co. v. Tunnel Trading, No. 98-5408, 2001 U.S. Dist. LEXIS 18738, at **12-13 (S.D.N.Y. Nov. 16, 2001) (quoting 15 U.S.C. §1127).

Because the Court has concluded that Seruga was the valid owner and registrant of the Mark beginning October 15, 2003, as of that date at least, Seruga/Excellent have standing to sue for injuries that occurred thereafter.  The issue before the Court, however, is whether Seruga/Excellent have standing to sue for injuries that occurred prior to that date.  The Court concludes that the CSA that the parties signed on April 24, 1997, released all putative claims of each party against the other prior to that date, and therefore, the Court concludes that the window that it now must examine lies between April 24, 1997, and October 15, 2003.

Prior to the dissolution of R&K Zinn Corp., Excelsior was the exclusive United States

distributer of ARTOFEX products, but Seruga had maintained the relationship with the owners and managers of ARTOFEX products over the years that she and Zinn were in business together.  In furtherance of the dissolution of their company, and in respect to ARTOFEX products, the CSA provides in relevant part:

> (f)    Richard and Excalibur, and Karin and Excellent will not represent, state or imply, in any trade publication or otherwise, that they are offering for sale any equipment or parts manufactured by Artofex or by any licensor of the Artofex product or name unless said representations are true in fact.  However, each party shall be entitled to purchase, rehabilitate and sell Artofex equipment; and shall be entitled to make, advertise and sell parts (using the designation triple action mixer and or the designations PH15, PH20, PH30), which can be used with or substituted for original Artofex equipment, and both parties can advertise that they are capable of servicing Artofex equipment as long as such statements are true.

(PX4.)  The Court interprets this language, and concludes as a matter of law, that the Order only permits the parties to represent, state, or imply that they are offering for sale any ARTOFEX product if such fact is true.  Zinn could only truthfully represent that he could sell, rehabilitate, service, and do business with respect to used ARTOFEX products and parts.  Zinn also could also "make, advertise and sell parts" that he made himself, using the designation "triple action mixer," PH15, PH20, or PH30.  While the parties generally released each other from claims arising prior to this agreement, and agreed that the CSA, as of that date, was a complete and full understanding of the agreement, Seruga subsequently secured additional rights from F. Aeschbach and Mr. Wampfler, and therefore, this agreement was affected.  Because Seruga alone secured her future relationship with F. Aeschbach and the related companies in control of the Mark, as is evidenced by the letter dated April 24, 1997, she was the only party that in fact could represent that she was the true exclusive distributor of the Mark in the United States. (DX127.)  Neither F. Aeschbach, Mr. Wampfler, nor

any of their affiliates, licensees, or assignees were bound by or affected by the CSA.

The CSA also provides that "[n]othing herein shall be deemed to be an admission or concession by Richard that Karin or Excellent have the exclusive license in the United States for the Artofex name or product." (PX4.)  Therefore, the Court concludes that the parties considered that such was Seruga's contention and agreed not to address it or settle it within the CSA or prior to signing the CSA.  The letter dated April 24, 1997, from Mr. Kaeser as representative  of Pitec AG "[i]n charge of all ARTOFEX [a]ffairs," in which Mr. Kaeser writes that Seruga and Excellent Bakery are the "sole Agency in the USA to manufacture/produce ARTOFEX PARTS and ARTOFEX ASSEMBLIES for all ARTOFEX EQUIPMENT in the UNITED STATES OF AMERICA" and that "No one else is legally authorized to manufacture/produce any ARTOFEX PARTS for any ARTOFEX equipment or market them under the REGISTERED TRADEMARK ARTOFEX in the USA" affected Defendant Seruga's ability to truthfully state that she had new ARTOFEX products for sale. (DX127.)  The Court therefore concludes that Seruga indeed was the exclusive distributor for new ARTOFEX products as of April 24, 1997.

As an exclusive distributor of the ARTOFEX Mark in the United States, one has standing to bring a claim for infringement where the person is a "registrant," which "include[s] legal representatives, predecessors, successors and assigns of the registrant."  15 U.S.C. §1114(1).  See also DEP Corp. v. Interstates Cigar Co., 622 F.2d 621, 622 (2d Cir. 1980) (distinguishing and differentiating the facts of its own case, where plaintiff had no property interest in the trademark and where a clause in the parties' contract expressly denies plaintiff interest in the trademark, from other cases holding that the exclusive distributor had standing to bring suit for infringement).  The Court notes that the April 24, 1997 letter to Seruga from Kaeser does not address the issue.  However,

Kaeser described in his deposition that Seruga defended F. Aeschbach or Kolb in lawsuits against them in the United States, and that defending those actions was "[a] part . . . a task . . . a duty" under the exclusive distributorship agreement but that he did not know whether there was a written agreement stating such a duty.  (Kaeser Dep. 25:3-10).  Seruga also stated that while she was the exclusive distributor of ARTOFEX products with Excelsior, she also was "defending Artofex here in any kind of problem that came up."  (11/24/08 Tr. 157:10-11.)  However, the parties did not provide any examples of Seruga legally defending Artofex in the United States, and rather, spoke about it generally.  But, because the agreement does not say that Seruga does not have any interest in the Mark in the letter, the Court concludes that Seruga/Excellent have standing pursuant to 15 U.S.C. §1114(1), and concludes that Seruga/Excellent were the legal representatives of  F. Aeschbach in the United States during that time period.  The Court, however, also concludes that the 2003 assignment did not convey the right to sue for past infringements.  The standing that Seruga has to sue for events during the 1997 to 2003 period stem from her duty to defend the Mark in the United States as the exclusive distributor of ARTOFEX, as the testimony revealed, was part of their understanding.

ii.   Whether the Doctrine of "Unclean Hand" Precludes Seruga/Excellent's Relief

"The doctrine of unclean hands will deny equitable relief 'when the party seeking relief is guilty of fraud, unconscionable conduct, or bad faith directly related to the matter at issue that injures the other party and affects the balance of equities.'" Saudi Basic Indus. Corp. v. ExxonMobil Corp., 401 F. Supp. 2d 383, 386 (D.N.J. 2005) (citing Paramount Aviation Corp. v. Agusta, 178 F.3d 132,

147 n.12 (3d Cir. 1999)).  Because the Court has not concluded that Seruga/Excellent's actions were fraudulent, unconscionable, or done in bad faith, the Court concludes that application of this doctrine is not appropriate.

iii.   Whether the Doctrines of Collateral Estoppel and Res Judicata Preclude Seruga/Excellent's Relief

The Third Circuit uses the term "claim preclusion" when referring to the traditional doctrine of res judicata.  See United States v. Athlone Industries, Inc., 746 F.2d 977, 983 n.4 (3d Cir. 1984) (equating claim preclusion with res judicata or "the preclusive effect of a judgment in foreclosing relitigation of the same causes of action" and equating issue preclusion with collateral estoppel or "the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided").  This affirmative defense was properly raised in Plaintiffs' Answer to Defendants' counterclaims (Docket Entry No. 27.)  However, the Court never previously addressed this issue.

The issues raised and relief sought in conjunction with the New Jersey Superior Court action, Docket No.  C-276-02, was for enforcement of the CSA, and in fact, on April 16, 2003, Judge Escala filed an Order to Show Cause requiring that Zinn/Excalibur abide by the CSA's parameters.  The relief sought was equitable, and the parties have not brought to this Court's attention a decision regarding trademark infringement in that action.  Rather, before the Court is a notice of dismissal, dated March 1, 2004.  (PX8.)  Therefore, here, the only preclusive effect that the previous litigation has is to preclude litigation, for which equitable relief is sought, to enforce the CSA for actions that occurred that were at issue in that matter.

Seruga/Excellent filed another action in New Jersey Superior Court, Law Division, Bergen

46

County, Docket No. L-6432-04, on April 2, 2004, stating that Zinn/Excalibur continued to violate

the CSA among other causes of action.  (PX9.)  Magistrate Judge Arleo signed a consent order on

January 27, 2007, consolidating that state action with the federal action that Zinn/Excalibur had filed

in this court, Civil Action No. 05-3572.  (Docket Entry No. 30.)  Therefore, those injuries are made

a part of this action and neither collateral estoppel nor res judicata applies to preclude adjudication

of those claims.


       iv.     <u>Whether Zinn/Excalibur's Claims of Laches and Statutes of
Limitations issues Preclude Relief</u>

      "Laches is an equitable defense which, if successful, bars recovery of damages for

infringement which occurred prior to the filing of suit." <u>Stryker Corp. v. Zimmer, Inc.</u>, 741 F. Supp.

509, 512 (D.N.J. 1990).  The Court, in addressing such a defense, will consider when the owner of

the mark "'knew or should have known' of the infringing activity to determine whether [there was]

. . . unreasonabl[e] delay[] in bringing suit." <u>Miller v. Glenn Miller Prods.</u>, 454 F.3d 975, 980 (9th

Cir. 2006) (citations omitted).  Actual or constructive notice is sufficient to support such a claim.

<u>See id.</u> (citing 5 McCarthy on Trademarks §31:38, at 31-82.)  "Because the Lanham Act does not

contain a statute of limitations, federal courts have referred to analogous state statutes of limitations

to determine whether a presumption of laches should apply." <u>Hot Wax, Inc. v. Turtle Wax, Inc.</u>, 191

F.3d 813, 821 (7th Cir. 1999).  The limitations period is used as a "baseline" to help decide if the

doctrine of laches should bar the claim.  <u>Tandy Corp. v. Malone & Hyde, Inc.</u>, 769 F.2d 362, 365

(6th Cir. 1985) (observing that it is "'presume[d]' that an action is barred if not brought within the

period of the statute of limitations and is alive if brought within the period").  In New Jersey, the

statute of limitations for tortious injury to personal property and for breach of contract, "shall be commenced within 6 years next after the cause of any such action shall have accrued."  N.J.S.A. §2A:14-1.  Further, the "continuing wrong" doctrine has been applied to cases involving infringement, which provides that so long as the last "wrong" act occurred within the statutory period, the doctrine of laches should not be applied.  Hot Wax, Inc., 191 F.3d at 821 (citing Taylor v. Meirick, 712 F.2d 1112, 1118 (7th Cir. 1983)).

The Court concludes that Seruga/Excellent did not unreasonably delay in enforcing the use of the Mark.  Seruga/Excellent filed the state action on April 16, 2004.  (PX9.)  Further, the majority of the acts that Seruga/Excellent claimed were improper under the relevant causes of action occurred within the six year period.  The Court, therefore, rejects Zinn/Excalibur's defense and applies the continuing wrong doctrine.  The last "wrong" that Seruga/Excellent allege Zinn/Excalibur committed was well within the six year statutory period.  Therefore, the Court will consider all claims that arose after April 24, 1997, that are not otherwise precluded as a result of the 2002 State action, culminating in the April 16, 2003 Order to Show Cause and the Order of Dismissal in that action.

**c.    The Parties' Respective Trademark Infringement and Unfair Competition Claims**

Federal trademark infringement, 15 U.S.C. §1114, and federal unfair competition, 15 U.S.C. §1125(a)(1)(A), are assessed under identical standards.  A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000).  "To prove either form of Lanham Act violation, a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of

confusion." A&H Sportswear, Inc., 237 F.3d at 210 (citing Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 437 (3d Cir. 2000); see also Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708-09 (3d Cir. 2004) (stating that "[t]o prevail on a claim of trademark infringement or unfair competition under the Lanham Act, the owner of a valid and legally protectable mark . . . must show that a defendant's use of a similar mark for its goods 'causes a likelihood of confusion.'") The plaintiff bears the burden of proof, and must meet the burden by a preponderance of the evidence. A&H Sportswear, Inc., 237 F.3d at 210-11 (citing Am. Home Prods. Corp. v. Barr Labs., Inc., 834 F.2d 368, 371 (3d Cir. 1987)).

The Third Circuit "has adopted a non-exhaustive list of factors to consider in evaluating likelihood of confusion, commonly referred to as the 'Lapp factors.'" Kos, 369 F.3d at 709 (citing Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983)).  "These factors were originally developed for cases involving non-competing products," and the Third Circuit "recently recognized that 'consideration of the Lapp factors . . . can be quite useful for determining likelihood of confusion even when to goods compete directly.'" Id. (quoting A&H Sportswear, Inc., 237 F.3d at 212).  The factors are:

(1)     the degree of similarity between the owner's mark and the alleged infringing mark;

(2)     the strength of the owner's mark;

(3)     the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4)     the length of time the defendant has used the mark without evidence of actual confusion arising;

(5)     the intent of the defendant in adopting the mark;

(6)     the evidence of actual confusion;

(7)     whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8)     the extent to which the targets of the parties' sales efforts are the same;

(9)     the relationship of the goods in the minds of the consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10)    other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

Kos, 369 F.3d at 709 (quoting A&H Sportswear, Inc., 237 F.3d at 215).  "'None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other.'"  Kos, 369 F.3d at 709 (citing Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 280 (3d Cir. 2001)).

The Court has previously concluded that Seruga is the owner of the Mark, and that discussion supports the conclusion that the ARTOFEX Mark is valid and legally protectable.  Therefore, the Court will turn its discussion to the third factor, namely, whether Zinn/Excalibur's "use of the mark to identify goods or services causes a likelihood of confusion." A&H Sportswear, Inc., 237 F.3d at 210 (citation omitted).  The Court concludes that Zinn/Excalibur's actions have caused a likelihood of confusion.

Zinn/Excalibur have been using the exact trademark, ARTOFEX, in their advertising in Modern Baking Magazine, by selling products under that name and using the Mark for their products, by registering the trade name "Artofex Machine LLC" and using that trade name on invoices, by issuing price quotations to prospective customers for a new ARTOFEX Triple Action

50

Mixer, for entertaining requests for ARTOFEX products, by providing "PH" parts that are compatible with customers' ARTOFEX machines without telling the customers that they are not genuine ARTOFEX products, by placing the words ARTOFEX in the metatags of their website for searchability on search engines for new ARTOFEX products, by using the phrase "ART OF EXcalibur" on the Excalibur website, and by using the name "ARTOFLEX" that is substantially similar to the protected Marks.

The Court also concludes that within the baking machinery industry, ARTOFEX is a strong mark, and the evidence supports this conclusion. The evidence also reveals that ARTOFEX machines last for a long time, and customers, due to the price of a new machine, may opt to have their machine fixed rather than buy one new. There is also evidence of actual confusion, created by Zinn, due to use of the Excelsior phone number and advertising, and Seruga/Excellent have provided evidence of this actual confusion regarding several customers. Zinn/Excalibur acknowledge that approximately twenty customers have been actually confused because they received an invoice labeled "Artofex Machine LLC."

The Court concludes that Zinn/Excalibur intended to adopt the Mark. Having registered the businesses Artofex Machine LLC, and Artofex Machine Inc., creating invoices with the name Artofex printed on top that were received by at least twenty customers, writing "Artofex" on the invoices for new products sold, registering a website with the word "Artofex" in the domain name, and including "Artofex" in the metatags of its Excalibur website for new products, the Court is convinced that Zinn/Excalibur intended to adopt the Mark, and that Zinn/Excalibur disregarded Seruga's claim to the Mark. Even prior to the signing of the CSA, in a letter dated  October 20, 1995, Mr. Haller notified Zinn that Seruga was the exclusive distributor of the ARTOFEX products,

51

in her capacity at Excellent.  The Court concludes that Zinn was absolutely given actual notice from the company that he was not permitted to use the Mark; his subsequent actions were clearly taken with the intent to adopt the Mark nevertheless.

Further, the Court concludes that the evidence shows that Zinn/Excalibur and Seruga/Excellent were and still are competitors, using the same trade channels and means to market and advertise their goods and services.  Specifically, there is evidence that they both advertise in Modern Baking, attend the same trade shows, and significantly use the internet in their marketing efforts.  The parties also agree that they are competitors and that they have overlapping customer bases and sell many of the same products to their customers.   The goods that they each sell are nearly identical insofar as Zinn produces parts, designated "PH," that are compatible with ARTOFEX machines.  Further, Zinn has sold products actually using the brand name ARTOFEX, that are nearly identical or identical to an actual ARTOFEX product with a similar or identical function.

The Court, having thus considered the Lapp factors, concludes that Zinn/Excalibur are liable for infringing upon the use of Seruga/Excellent's trademark, and Zinn/Excalibur are also liable for unfair competition, as that cause of action is brought and considered using the same standard of law.  See A&H Sportswear, Inc., 237 F.3d at 210.  The Court also concludes that Seruga/Excellent's acts do not constitute unfair competition as Seruga is the valid owner of the ARTOFEX Mark in the United States, and therefore, her actions are consistent with ownership.  Zinn/Excalibur's claims regarding false advertising and fraud must likewise fail.[8]

---

[8]      Zinn/Excalibur sought to admit PX10a-10k for the purpose of showing that Seruga/Excellent engaged in unfair competition and false advertising, and the Court reserved on the issue.  Given the Court's determinations regarding ownership, the issue here is moot.

### d.      Seruga/Excellent's Counterfeiting Claim

"To establish federal trademark counterfeiting, the record must show that (1) the defendants

infringed a registered trademark in violation of the Lanham Act, 15 U.S.C. §1114(1)(a), and (2)

intentionally used the trademark knowing that i[t] was counterfeit or was willfully blind to such use."

Louis Vuitton Malletier & Oakley, Inc. v. Veit, 211 F. Supp. 2d 567, 580 (E.D. Pa. 2002) (citing

Playboy Enter., Inc. v. Universal Tel-A-Talk, Inc., No. 96-6961, 1998 U.S. Dist. LEXIS 8231 (E.D.

Pa. Nov. 3, 1998)).  The applicable standard for counterfeiting under New Jersey State law similarly

prohibits the following conduct:

> (1)      The use, without consent of the owner or designee, of any reproduction,
> counterfeit, copy, or colorable imitation of a mark in connection with the sale,
> distribution, offering for sale, or advertising in this State of any goods or
> services on or in connection with which the use is likely to cause confusion

---

However, to the extent that the Court must still address the issue, the Court concludes that the exhibits must be excluded.  There is a hearsay problem with these documents.  They purport to be Seruga/Excellent's prior statements that Seruga has written on the internet, and Zinn/Excalibur seek to admit them for that truth under the party-opponent exception.  However, while the documents purport to be from Seruga/Excellent's website, they have not been authenticated.  Therefore, because all that Zinn/Excalibur have produced to further authenticate these documents is a Declaration signed by Mr. Richard Joel, Jr., Esq., Zinn/Excalibur's attorney, which incidentally would make Mr. Joel a witness in the matter, the Court denies the admission of these documents into evidence.

The Court recognizes that the problem is that people can constantly update their website.  Therefore, according to Mr. Richard Joel, Jr., he accessed a service on the internet at a particular website called "www.archive.org" that he says is like a library of old internet pages. He has apparently used this service to find "old" statements made by Seruga that she apparently has written on her website.  However, Zinn/Excalibur have not called a witness from that organization to authenticate its compilation and storage of such information, or provided any other valid means to authenticate them.  Rather, Zinn/Excalibur have filed their own declaration saying that Zinn/Excalibur's attorney used the service provided by this other website/business, and that the documents thus provided to the Court are those that this search produced.  Because Seruga/Excellent have not stipulated that these pages are indeed from Seruga/Excellent's website, and because the Court concludes that Zinn/Excalibur have failed to sufficiently authenticate them, their admission is denied.

or mistake or to deceive as to the source of origin of the goods or services; or

(2)     The reproduction, counterfeiting, copying or colorable imitation of a mark and the application of a reproduction, counterfeit, copy or colorable imitation of a mark to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used upon or in connection with the sale or other distribution in this State of the goods or services.

N.J.S.A. § 56:3-13.16(a).

The Court concludes that under the Lanham Act, Seruga/Excellent have met their burden of proof and shown that Zinn/Excalibur infringed upon ARTOFEX, a registered trademark, and that Zinn/Excalibur did so intentionally.  Seruga/Excellent point out that the only difference between infringement's and counterfeiting's legal standard is that Seruga/Excellent must show that Zinn/Excalibur either knew or were willfully blind in the intentional use of a registered mark, and upon such a showing, the owner of the Mark would be entitled to treble damages.  The evidence shows that Zinn/Excalibur were given actual notice of the true ownership of the Mark, and actual notice regarding the exclusive distributorship agreement between Seruga and Kolb; that Zinn/Excalibur were also under constructive notice of the true ownership of the Mark, and nevertheless, used the name ARTOFEX in connection with the products that they sold; that they used the Mark in the name of a business that they registered; that they used the Mark in connection with a website that was created; that they used the Mark in the metatags of the website for Excalibur; that they used the Mark in their advertising and tradeshow presence; that they used the Mark deceptively by naming a product the "ART OF EXcalibur triple action mixer;" and that they used the name "ARTOFLEX," which is substantially similar to the protected Mark and which Zinn acknowledged was a typographical error.  As the Court has previously discussed, such use has resulted in customer confusion and has been deceptive. Therefore, the Court concludes that Zinn/Excalibur in fact knew

54

that the products sold used the ARTOFEX name, which was a registered mark.  Zinn/Excalibur are therefore liable for counterfeiting under both federal and state law.

### e.      Seruga/Excellent's Cybersquatting Claim

"[C]ybersquatting is the act of registering, in bad faith and to garner profit, on the internet a domain name so similar to a distinctive mark that it is confusing."  Green v. Fornario, 486 F.3d 100, 103 n.5 (3d Cir. 2007).  See also Shields v. Zuccarini, 254 F.3d 476, 481-82 (3d Cir. 2001).  The statute provides that one is liable for cybersquatting when one "has a bad faith intent to profit from that mark" and "registers, traffics in, or uses a domain name that . . . is a trademark."  15 U.S.C. §1125(d)(1)(A).  Use of the disjunctive "or" necessarily leads to the interpretation of the statute that mere registration of a domain name results in liability, so long as the registrant also "has a bad faith intent to profit from that mark."  15 U.S.C. §1125(d)(1)(A).

The Court finds that Zinn/Excalibur never used the website "www.artofex-usa.com," that was registered under the company name, Artofex Machine LLC.   The Court also notes that there is no evidence in the record that shows that customers visited this particular website or used a website with this domain name to learn about or purchase ARTOFEX products from Zinn/Excalibur or that Zinn/Excalibur offered the domain name to another for financial gain.  See, e.g., Omega S.A. v. Omega Eng'g, Inc., 396 F. Supp. 2d 166, (D.C. Conn. 2005) (observing that, where it was not shown that the registrant of the domain name made use of it, the evidence was not sufficient to conclude that registrant had the bad faith intent to profit from the mark under the statute).  However, the evidence clearly shows that Zinn/Excalibur's other actions that were in concert with the registration of this domain name were done with the bad faith intent to profit from use of the ARTOFEX Mark.

The Court has previously discussed at length the efforts that Zinn/Excalibur took to adopt the Mark and knowingly use the Mark while infringing on the owner's rights to the Mark.  Therefore, given the totality of the factual circumstances, the Court concludes by a preponderance of the evidence that Zinn/Excalibur in fact registered this domain name with the bad faith intent to profit from the Mark, and that even though Zinn/Excalibur did not actually use the website, they remain liable for cybersquatting under the law.

### f.    Seruga/Excellent's Dilution of the Mark Claim

"The federal cause of action for trademark dilution grants extra protection to strong, well-recognized marks even in the absence of a likelihood of consumer confusion . . . if the defendant's use diminishes or dilutes the strong identification value associated with the plaintiff's famous mark." Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C., 212 F.3d 157, 163 (3d Cir. 2000). "Dilution is defined as 'the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception.'" 800-JR Cigar, Inc. v. GoTo.com, Inc., 437 F. Supp. 2d 273, 293 (D.N.J. 2006) (citing 15 U.S.C. §1125(c)).  To establish a prima facie claim for relief for dilution, the plaintiff must plead and prove by a preponderance of the evidence that:

(1)    The plaintiff is the owner of a mark that qualifies as a "famous" mark in light of the totality of the eight factors listed in §1125(c)(a),

(2)    The defendant is making commercial use in interstate commerce of a mark or trade name,

(3)    Defendant's use began after the plaintiff's mark became famous, and

(4)     Defendant's use caused dilution by lessening the capacity of the plaintiff's
        mark to identify and distinguish goods or services.

Times Mirror Magazines, 212 F.3d at 163.  New Jersey law also dictates consideration of similar

factors.   See N.J.S.A. §56:3-13.20;  800-JR Cigar, Inc., 437 F. Supp. 2d at 294 (stating that

"[d]ilution claims under New Jersey law are subject to the same considerations as federal dilution

claims). Seruga/Excellent argue that the Mark need not be "famous" in the sense of well-known

throughout the entire world, but rather, that the Court should apply the pre-amended statute's

standard, providing that "niche fame" is sufficient.

        The Court concludes that Seruga/Excellent have met their burden of proof.  Seruga/Excellent

have sufficiently proven, as this Court has previously discussed, that Seruga is the owner of the

ARTOFEX Marks in the United States, that within the baking equipment industry, ARTOFEX has

a high degree of distinctiveness, and that both Zinn/Excalibur and Seruga/Excellent operate within

that industry.  See Times Mirror Magazine, Inc., 212 F.3d at 165.  Zinn/Excalibur have made use of

the ARTOFEX Mark in interstate commerce, they began using the Mark inappropriately in at least

1997, after the Mark had already become famous, and Zinn/Excalibur's use of the Mark is likely to

or has "cause[d] dilution by lessening the capacity  of the . . . mark to identify and distinguish

goods."  Id. at 163.  The Court concludes that having considered the factors listed in 15 U.S.C.

§1125(c)(1), Seruga/Excellent have shown by a preponderance of the evidence the "requisite degree

of recognition."   The evidence certainly shows that the Mark is used world-wide by third parties,

that the Mark is recognized by consumers, that Seruga was first the exclusive distributor and is now

the legitimate owner of the Mark in the United States, and that Zinn/Excalibur intended to create

some sort of association with the Mark and intended to adopt the Mark through their actions.  One

example in particular of this dilution is the deposition of Philip Meinero, in which he states that he believes that Excalibur machines and ARTOFEX machines are the same. Therefore, the Court concludes that Zinn/Excalibur's actions, which the Court has discussed and addressed at length, constitute dilution under federal and state law.

### g. Seruga/Excellent's Breach of Contract and Interference with Prospective Business Advantage Claims

A party seeking to establish a breach of contract claim under New Jersey law must allege that: "(1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party performed its own contractual duties." Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 210 F. Supp. 2d 552, 561 (D.N.J. 2002). A party claiming tortious interference with a prospective business advantage, on the other hand, must establish: "1) a prospective economic relationship from which the plaintiff has a reasonable expectation of gain; 2) intentional and unjustifiable interference with that expectation, and 3) a causative relationship between the interference and the loss of the prospective gain." Cooper Distrib. Co. v. Amana Refrigeration, Inc., 63 F.3d 262, 281 (3d Cir. 1995) (citing Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739 (1989)).

For all of the reasons stated thus far, the Court concludes by a preponderance of the evidence that Zinn has breached the CSA's terms that are outlined in Section 3(f). Pursuant to the terms of the CSA, Zinn/Excalibur were not to "represent, state or imply, in any trade publication or otherwise, that they are offering for sale any equipment or parts manufactured by Artofex or by any licensor of the Artofex product or name unless said representations are true." (PX4.) The Court has found that Zinn/Excalibur indeed made such representations, when such representations were not in fact true,

as they were not offering authentic ARTOFEX products and were not authorized by the true owner of the Mark to use the Mark for their own economic benefit. The Court, in making this conclusion, considers only the actions by Zinn/Excalibur that occurred that were not included in the 2002 State action.

Regarding Seruga/Excellent's tortious interference claims, the Court concludes that Zinn/Excalibur are liable. Seruga/Excellent's support this cause of action by citing to the following facts: (1) Seruga/Excellent reasonably believed, as the exclusive distributor and subsequent owner of ARTOFEX in the United States, that customers in the United States would buy ARTOFEX products from them; (2) Zinn/Excalibur made malicious and false statements about Seruga, stating that she was dead (11/21/08 Tr. 120:7-13), and they inappropriately infringed upon and used the ARTOFEX mark and the old Excelsior phone number to divert sales, (see discussion, infra; 11/21/08 Tr. 125:6-8; 132:6-22); and (3) as a result of these activities, Zinn/Excalibur caused economic harm to Seruga/Excellent. The Court agrees that these facts, which the Court finds to have been proven, support the conclusion by a preponderance of the evidence that Zinn/Excalibur are liable for tortious interference with a prospective business advantage.

### h.  Seruga/Excellent's Fraud Claim

"Fraud is defined as: (1) a material misrepresentation of present or past fact; (2) knowledge of its falsity; (3) intention that the other party rely thereon; and (4) reasonable reliance by the other party." Asen v. Cooper Hosp./Univ. Med. Ctr., No. 95-869, 1996 U.S. Dist. LEXIS 8680, at **17-18 (D.N.J. June 7, 1996) (citing Lighning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1182 (3d Cir. 1993)).

The Court concludes that Zinn/Excalibur are not liable for fraud, insofar as Seruga/Excellent allege that Zinn signed the CSA without the intention of ever abiding by it.  Specifically, the Court looks to the language Section 3(f) of the CSA, and notes that the parties agreed that nothing therein would be "deemed to be an admission or concession by Richard Zinn that Karin or Excellent have the exclusive license in the United States for the Artofex name or product."  (PX4.)  The Court interprets this language, and construes it as meaning that Zinn reserved the right in the future to contest Seruga's right to the Mark.  Therefore, the Court concludes that Zinn is not liable for fraud, and that Seruga/Excellent have failed to meet their burden of proof.

### 3.   Damages

Seruga/Excellent make several arguments regarding their damages.  First, Seruga/Excellent argue that Seruga is entitled to Zinn/Excalibur's profits that stemmed from Zinn/Excalibur's infringing sales.  (Id. at 96 to 97.)  Seruga/Excellent maintain that "Plaintiffs[, however,] failed to offer evidence of deductions, relying instead on a rebuttal damages expert who did not only fail to consider the damages provision under the Trademark Laws, he admitted he is not familiar with the Lanham Act."  (Id. at 97.)  Seruga/Excellent also argue that "[b]ecause the parties are in competition, [Zinn/Excalibur's] profits from its infringing activities are an appropriate measure of [Seruga/Excellent's] damages."   (Id. at 98.)   Seruga/Excellent assert that equity warrants disgorgement of Zinn/Excalibur's profits and that "[t]here is no other adequate remedy if Plaintiffs' profits are not assessed."  (Id. at 99.)  Seruga/Excellent point out that "[i]t is the infringer who must prove all elements of costs or deductions" pursuant to 15 U.S.C. §1117(a).  (Docket Entry No. 166 at 32.)  Seruga/Excellent also argue that case law supports the proposition that where "'the infringer

fails to carry its statutory burden to offer evidence of deductions, the [owner's] entitlement to profits under the Lanham Act is equal to the infringer's gross sales.'" ((Id.)(citing WMS Gaming Inc. v. WPC Gaming Prod. Ltd., 542 F.3d 601, 609 (7th Cir. 2008))).

Seruga/Excellent argue that Mr. Richard F. Lane, Seruga/Excellent's damages expert, properly calculated Seruga/Excellent's damages, and estimated that Seruga/Excellent's damages are between $4,250,400.00 and $15,584,994.00. (Docket Entry No. 163 at 100.) Seruga/Excellent note that Mr. Lane's testimony to explaining the low-end of the range came strictly from sales of competing products sold under the name Artofex Machine, LLC. (Id.) Seruga/Excellent also note that this amount excludes consideration of whether treble damages should be awarded upon finding of willfulness or statutory damages. (Id. at 100 to 101.) Seruga/Excellent also maintain that Mr. Lane's conclusion "underestimates the damages, because Plaintiffs failed to provide all relevant documents during discovery" and "[a]t least 51 missing invoices for ARTOFEX sales are missing according to the log Plaintiffs were ordered to keep by Judge Escala in 2003." (Id. at 101.) Seruga/Excllent further assert that "[h]undreds of invoices more – identified because of the gaps in numbering – were not produced during discovery and Mr. Zinn testified that he did not even remember if his attorneys told him to retain relevant documents after litigation had begun." (Id.)

Seruga/Excellent also maintain that the testimony Mr. William J. Morrison, Plaintiffs' damages expert, was "worthless" because he "applied the incorrect legal standard to calculate damages." (Id. at 102.) Therefore, Seruga/Excellent argue that "Mr. Morrison's testimony and his report do not provide the Court with the tools it needs to measure appropriate deductions." (Id.)

Seruga/Excellent argue that they are entitled to damages under the ACPA due to "Plaintiffs' willful registration of the domain name www.artofex-usa.com and [the] bad faith maintenance of

the domain name under the name of the infringing and defunct entity Artofex Machine, LLC." (Id. at 103.)   Seruga/Excellent urge the Court to award them the maximum statutory amount, $100,000.00, pursuant to 15 U.S.C. §1117(d).

On the other hand, Zinn/Excalibur argue that Seruga/Excellent's expert Richard Lane "assumed the '276 trademark is valid" but it was an error to make such an assumption.  (Docket Entry No. 161 at 28.)   Zinn/Excalibur maintain that they would not be liable due to "past infringement prior to a valid assignment."  (Id.)  Zinn/Excalibur also point out that Mr. Lane failed to consider that the CSA released any claims prior to April 24, 2007, and that any award of damages should be "limited by the Statute of Limitations and laches."  (Id.)  They further argue that new mixers should be distinguished from refurbished ARTOFEX equipment in determining damages, and that it would be error to assume "all competing goods sold by Zinn during the period 1999-2003 and at any other time are infringing goods."  (Id. at 29.)  In addition, Zinn/Excalibur maintain that Seruga/Excellent's expert "did not break down his report by particular causes of action" and "failed to omit invoices for repair services and products in his calculations."  (Id.)  Zinn/Excalibur also aver that their costs must be deducted, leaving a net profit of approximately thirteen percent.  (Id.)  Zinn/Excalibur cite no case law in support of their arguments.

Pursuant to the Lanham Act, 15 U.S.C. §1117, recovery of damages is permitted.  The statute provides that "[w]hen a violation of any right of the registrant of a mark . . . shall have been established . . . the plaintiff shall be entitled, subject to the provisions of sections 29 and 32 . . . and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  Id. at §1117(a).  The statute further directs the manner in which a court shall assess damages, providing that "the plaintiff shall be required to prove

defendant's sales only; defendant must prove all elements of cost or deduction claimed.  In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." Id.  In addition, the statute states that "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." Id.

While an infringer has the statutory duty to produce evidence regarding "all elements of cost or deduction claimed" to offset the infringed's sales, where the infringer has failed to meet his or her burden of proof, a court may be "forced to use an alternative method to estimate . . . profits" and may do so given the fact that a "District Court has broad discretion in shaping remedies under" the statute. Banjo Buddies, Inc. v. Ronosky, 399 F.3d 168, 175, 177 (3d Cir. 2005)(listing the following factors that the court should consider in determining whether to disgorge the infringer's profits: "(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off" (citation and internal quotations omitted)).  Further, a "'claimant generally has the burden of proving by credible evidence to a reasonable certainty his damage, and the amount thereof must be established at least to a reasonable certainty.'" Id. at 178-79 (citing Plywood Oshkosh, Inc. v. Van's Realty & Constr. of Appleton, Inc., 257 N.W.2d 847, 849 (Wis. 1977)).  In some jurisdictions, a distinction may be drawn between the burden of proof to show that damages were sustained and the burden of proof to show the amount of any such damages.  Specifically, there is "a distinction between proof of the fact of damages, which must be established with at least reasonable certainty,

and the amount of damages, which may be estimated, provided it is not merely speculative."

Thompson v. Haynes, 305 F.3d 1369, 1382 (Fed. Cir. 2002) (citing Story Parchment Co. v. Paterson

Parchment Paper Co., 282 U.S. 555, 563-64 (1931); Montreal Trading Ltd. v. Amax Inc., 66 F.2d

864, 868 n.1 (10th Cir. 2002)).  One court has observed that "when a trademark plaintiff offers

evidence of infringing sales and the infringer fails to carry its statutory burden to offer evidence of

deductions, the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's

gross sales."  WMS Gaming, Inc. v. WPC Prods. Ltd., 542 F.3d 601, 609 (7th Cir. 2008)(citation

omitted).  See also N.Y. Racing Ass'n v. Stroup News Agency Corp., 920 F. Supp. 295, 301

(N.D.N.Y. 1996)(stating that "when a trademark plaintiff offers evidence of infringing sales and the

infringer fails to carry its statutory burden to offer evidence as to the costs of goods sold, then the

profits to which the plaintiff is entitled under the Lanham Act are equal to the infringer's gross

sales").

Courts' reliance on gross sales without deducting costs when the infringer fails to meet his

or her burden is an available remedy, and some courts have held that gross sales must be relied upon

despite the "'windfall to the [trademark] owner.'" Am. Taxi Dispatch, Inc. v. Am. Metro Taxi &

Limo Co., 582 F. Supp. 2d 999, 1008 (N.D. Ill. 2008)(citing WMS Gaming, Inc., 542 F.3d at 609).

"[U]nless the infringer could provide evidence that it did not earn some or all of its profits by

infringing the owner's marks, 'it promotes honesty and comports with experience to assume that the

wrongdoer who makes profits from the sales of goods bearing a mark belonging to another was

enabled to do so because he was drawing upon the good will generated by that mark.'" WMS

Gaming, Inc., 542 F.3d at 608 (citing Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,

316 U.S. 203, 207 (1942)). See also Nintendo of Am., Inc. v. Dragon Pac. Int'l, 40 F.3d 1007, 1012

(9th Cir. 1994) (stating that "where infringing and noninfringing elements of a work cannot be readily separated, all of a defendant's profits should be awarded to a plaintiff"); Wesco Mfg. v. Tropical Attractions of Palm Beach, Inc., 833 F.2d 1484, 1488 (5th Cir. 1987)(stating that "[a]lthough the exact amount of infringing sales cannot be determined from the [evidence], exactness is not required. [The defendant] is in the best position to ascertain exact sales and profits, and it bears the burden of doing so in an accounting"); id. at 1487-88 (stating that "[a] plaintiff need not demonstrate actual damage to obtain an accounting of an infringer's profits . . . . It is enough that the plaintiff proves the infringer's sales.  The burden the shifts to the defendant, which must prove its expenses and other deductions from gross sales" (citations omitted)).

In Banjo Buddies, the Third Circuit affirmed the District Court's determination that the infringer failed to meet his burden of proof regarding costs and damages.  399 F.3d at 177.  The Banjo Buddies Court noted that the District Court has broad discretion in fashioning a just remedy under the circumstances where the infringer has failed to meet its burden, and the District Court, due to the insufficient evidence of costs, relied on the defendant's business manager's testimony regarding the profit margin, or "bottom line" in order to fashion an appropriate award.  Id.; see also Burger King Corp. v. Weaver, 169 F.3d 1310, 1321 (11th Cir. 1999) (ordering an accounting to determine lost profits and noting that such "[a]n accounting for profits has been determined . . . to further the congressional purpose by making infringement unprofitable, and is justified because it deprives the defendant of unjust enrichment and provides a deterrent to similar activity in the future" (citing Burger King Corp. v. Mason, 855 F.2d 779, 781 (11th Cir. 1988)).

The Court has previously concluded that Zinn/Excalibur is not liable for acts prior to April

24, 1997.[9]  The evidence also shows that Zinn/Excalibur did not produce accounting records and they represent that they do not create accounting records, and as a result, the Court concludes that "exactness" is not achievable in this instance.  Seruga/Excellent's damages expert, Mr. Lane, testified that his office received two productions of invoices from Zinn/Excalibur.  The first arrived in two batches and represented invoices reflecting ARTOFEX products and sales of products for use in ARTOFEX equipment.  The second production of invoices included invoices reflecting sales of all competing products, and those products that were included in this list were agreed upon by the parties.  Because Zinn/Excalibur does not have a formal accounting system, Mr. Lane began the task of organizing the information from the invoices to calculate Zinn/Excalibur's gross sales for each year.  These gross sales were further divided in accord with the invoices produced in the first production and those revealed in the second production.  Mr. Lane testified that the year of sale was not recorded on some invoices, and these were computed as well.  (DX7.)  Mr. Lane also observed that the tax returns that Zinn/Excalibur produced reflected different gross sales than he calculated after organizing and adding up the information on the invoices.  (DX13.)  To that end, Mr. Lane described that Zinn testified that on his tax returns for 2006, he declared $2,233,970.00 in gross sales, but based upon Mr. Lane's computations from the produced invoices, gross sales for 2006 were $3,170,717.00.    Moreover, Mr. Lane noted for the Court that he did not receive complete information for any year after 2006, and therefore, this Court will only consider up to and through 2006 in its calculations.  Mr. Lane also testified that he believed that Zinn/Excalibur failed to

---

[9]     Given this Court's holding that damages are proper for the period from April 24, 1997 through 2006, Zinn/Excalibur's Motion to Preclude Defendants from introducing evidence of damages prior to October 15, 2003, is denied.  (See Docket Entry No. 124)

produce all of their invoices for year 1999, as his calculations showed a "significant reduction" in the number of invoices and gross sales.  Mr. Lane, to better estimate gross sales, determined that Zinn/Excalibur failed to produce information representing approximately $500,000.00 worth of sales for 1999, and for the purposes of his calculations, he added that amount.  (DX13.)  Mr. Lane also testified that Zinn/Excalibur, based on the invoices produced, did not comply with the state court order to complete a ledger, and Mr. Lane concluded that the entries in the ledger accounted for approximately $96,000.00 in gross sales "to Excelsior customers that are documented by these invoices that were produced," but that at least fifty-one invoices to old Excelsior customers were missing from Zinn/Excalibur's production.

Mr. Lane's report has broken down the numbers in a variety of ways, such that the Court has the ability to include and exclude that which it deems appropriate given the circumstances of this case.  Mr. Lane testified that these numbers resulted in a range of damages, from $4,250,405.00, which is "based on the sale of pH part number products for use in pH models including the information from both sales invoices and purchase information," to $13,796,479.00, which represents total revenue of Excalibur from the sale of products in competition with Excellent, to $15,584,986.00,  which represents "total revenue of Excalibur from sale of products in competition with Excellent" plus "the estimated sales revenues of Excalibur from products sold for which sales invoices were not produced based on purchase orders for parts cast."  (11/26/08 Tr. 39-44.)

Zinn/Excalibur's expert witness, Mr. Morrison, testified that he did not understand the vast range reflected by Mr. Lane's conclusion, and that he was skeptical about Mr. Lane's report because it did not address the "causation" issue, specifically, how he arrived at the conclusion that certain acts of Zinn/Excalibur caused the damages outlined. (11/26/08 Tr. 71:20-72:3.) Mr. Morrison stated

that "Mr. Lane has done a compilation of invoices and, insofar as his compilation is correct, that's a correct compilation.  It's gross revenues, not net revenues, and I don't see how, if we reduced it to net revenues, where the damages are. . . . I'm baffled." (11/26/08 Tr. 75:21-25.)  Mr. Morrison also pointed out that any lost profits that Seruga/Excellent asserted could have been caused by something else, such as other vendors assuming market share or failing to lower their prices to remain competitive in the market.  (11/26/08 Tr. 78:11-21.)  Mr. Morrison also stated that the best way to calculate damages in this instance would be to determine net profits, averaging what he determined to be the relevant figures for years 1996 through 2006, as percentages, and concluded that Zinn/Excalibur's gross profit for these years was 26.2%, which Mr. Morrison defined in his report as "revenue less direct costs of production and direct costs of sales items, such as commissions."  Further, Mr. Morrison concluded that Zinn/Excalibur's estimated net profit margin on ARTOFEX products is 13.5%.  (PX55 at 17-18.)  Mr. Morrison, however, announced or confirmed that he is "not particularly familiar with the Lanham Act," (11/26/08 Tr. 113:14), that his report fails to apportion costs in relation to product line, (11/26/08 Tr. 114:6-8), that his report does not break down costs that relate specifically to ARTOFEX product sales, by year, by product category, by sales of new machines, or by sales of new parts (11/26/08 Tr. 130:3-131:1), that he does not understand the difference between trademark infringement and unfair competition, (11/26/08 Tr. 120-121); and that he was not able to do a computation differently than Mr. Lane given Zinn/Excalibur's lack of accounting system (11/26/08 Tr. 132:7-11).

The Court concludes that under the proper standard governing damages for trademark infringement, Seruga/Excellent has the burden to prove to a reasonable certainty Zinn/Excalibur's

gross sales, and the Court finds Mr. Lane's testimony and report reliable and credible.[10]  With respect

to trademark infringement, the Court concludes that Seruga/Excellent met their burden of proof and

provided evidence to a reasonable certainty of gross sales.  The Court will consider as part of the

number comprising gross sales only those that occurred from April 1997 through 2006.  Mr. Lane

has not broken the numbers down by month, and therefore, the Court computes the average amount

per month for year 1997.  Further, because the parties are competitors and pursuant to the CSA

agreed that they would be competitors, the Court concludes that it would be unjust to consider gross

sales for products that are not PH products. The following amounts, taken from the uncontested

calculations listed in DX7 and DX11 comprise gross sales:[11]

| | |
|---|---|
| 1997 | $89,275.08 |
| 1998 | $457,164.43 |
| 1999 | $112,852.55 |
| 2000 | $406,760.56 |
| 2001 | $446,827.77 |
| 2002 | $304,889.95 |
| 2003 | $351,611.69 |
| 2004 | $195,587.51 |
| 2005 | $415,586.49 |

---

[10]     Accordingly, Zinn/Excalibur's Motion to Exclude Defendants' Damage Expert Report and preclude Defendants' Damage Expert from testifying at trial is denied.  (See Docket Entry No. 124.) The report properly assumes liability for the purpose of the calculations.

[11]     The parties did not provide the Court with gross sales information for either a daily or monthly basis, and therefore, the Court calculated the average daily and monthly price so as to compute the average gross sales for the last six days in April 1997 and the last eight months of 1997 to arrive at the total gross sales that are properly considered for 1997.

| 2006 | $1,142,291.82 |
|------|---------------|
| **TOTAL** | **$3,922,847.85** |

In other words, the Court under the totality of the circumstances will consider gross sales for products that are designated as "PH" products (DX16), and it will not consider gross sales for years 1995, 1996, or 2007.[12]

Mr. Lane surmised that Zinn/Excalibur did not produce all of the invoices for 1999, and the Court concludes that indeed, Zinn/Excalibur failed to produce all invoices considering the overwhelming evidence, consideration of purchase information, and significant difference in gross sums for other years. However, the Court will not adopt the $500,000.00 sum that Mr. Lane suggested should be added. Mr. Lane's estimate of $500,000.00 in missing sales is based on the combined amount of invoices produced for PH products and for all other non-PH competing products. When only examining the PH products and the produced invoices, however, the disparity between 1999, which shows $112,852.55 in gross sales, and respectively 1998, showing $457,164.43 in gross sales, and 2000, showing $406,760.56 in gross sales, the estimate appears to be only $300,000.00. Accordingly, the Court will add $300,000.00 for invoices that it finds were not produced. Therefore, gross sales totals $4,222,847.85.

The Court also concludes that Zinn/Excalibur has failed to meet its burden of proof under

---

[12]    It is the Court's understanding that these sales are for new and used equipment. Accordingly, the Court denies Zinn/Excalibur's Motion to Limit Defendants' introduction of evidence of damages to new ARTOFEX equipment only. (See Docket Entry No. 124.) The Court has exercised its discretion and concludes that these figures appropriately represent gross sales, in accord with the statute, and that while Zinn/Excalibur may be permitted to sell used Artofex equipment and non-authentic replacement parts pursuant to law and to the CSA, Zinn/Excalibur's actions, under the totality of the circumstances, warrant consideration of gross sales as all products designated as PH products for these years.

the Act and has not provided any information regarding its costs or claimed deductions from the gross revenues.[13]   However, the Court recognizes its broad discretion in awarding damages under the Act and given the totality of the circumstances, the Court will follow the method that the Third Circuit affirmed in Banjo Buddies, 399 F.3d at 177.   Mr. Morrison testified that for Artofex products, the profit margin, excluding fixed costs, is 13.5%, and the Court finds this credible. As a result, the Court will award  $570,084.46 for trademark infringement.  The Court's decision takes heavily into account that the Mark was used jointly by both parties while married and operating Excelsior, and though Zinn/Excalibur's use of the Mark was willful, the parties knew and planned to compete with each other after the dissolution of their marriage and business.

Seruga/Excellent have also demanded treble damages.  Pursuant to the statute, "[i]n assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."  15 U.S.C. §1117. Damages are treated separately from profits, and regarding damages, a court may award the infringed up to three times the actual damages.  "[T]o be eligible for Lanham Act treble damages, the plaintiff must prove that the defendant's conduct was intentional."  Vector Prods. v. Hartford Ins. Co., 397 F.3d 1316, 1320 n.3 (11th Cir. 2005) (citing Chanel, Inc. v. Italian Activewear of Floriday, Inc., 931 F.2d 1472 (11th Cir. 1991)).  However, as this Court interprets the statute, the discretion to award treble damages is the Court's.  While intentional or wilful conduct must be a present factor in determining that the amount of damages should be upwardly adjusted, the statute does not require this

---

[13]      The Court denies Seruga/Excellent's Motion in Limine to Strike the Expert Report and Exclude the Proposed Testimony of Plaintiffs' Expert William Morrison (PX55) (Docket Entry No. 126), because the cross-examination of the expert brought forth the necessary details in order for this Court to weigh the credibility and assess damages pursuant to the statute. The Court considered the testimony and weighed its worth accordingly.

enhancement, and given the totality of the circumstances of this case, the Court will exercise its discretion and refuse to increase the amount of the award.  While Zinn/Excalibur intentionally used the Mark, and knowingly did so, the Court weighs that fact against the unique history between the parties, and the history of Zinn's use of the Mark while working with his wife in their jointly-owned business as exclusive distributors of ARTOFEX products, and  while Zinn/Excalibur's actions involving infringement were intentional and he defiantly refused to comply with previous courts' orders to stop using the Mark, this Court recognizes that this dispute is essentially between bitter ex-spouses, with each feeling that they are the wronged party.

Seruga/Excellent seek statutory damages for counterfeiting for treble damages.  See 15 U.S.C. §1117(c).  Section 1117(c) of Title 15 of the United States Code provides that rather than receiving actual damages and profits under subsection a, a litigant may elect statutory damages under subsection c.  Because the thrust of Seruga/Excellent's argument supports receipt of damages under subsection a, the Court will not address any assertion to a right to damages under subsection c, as the statute is clear that a litigant may elect one or the other, but not both.

Seruga/Excellent also seek statutory damages pursuant to the ACPA, 15 U.S.C. § 1117(d), 15 U.S.C. § 1125(d)(1)B)(i)(VII)), for cybersquatting.  Seruga/Excellent argues that even though the domain name was never used, "[t]he ACPA recognizes the harm done to a trademark owner simply by the bad faith registration of an infringing domain name; nothing more is required," and the harm done is that the "domain name is no longer available for the legitimate trademark owner's use and profit." (Docket Entry No. 163 at 103).  Accordingly, Seruga/Excellent demand the maximum award of $100,000.00.  The relevant portion of the statute provides that one may seek "an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the

court considers just" but that the infringed "may elect, at any time before final judgment . . . to recover, instead of actual damages and profits [pursuant to 15 U.S.C. 1117(a)], an award of statutory damages." 15 U.S.C. §1117(d).   Therefore, like the issue concerning the counterfeiting charge, the thrust of Seruga/Excellent's argument supports receipt of damages under subsection a, and as a result, the Court will not address any assertion to a right to damages under subsection d, as the statute is clear that a litigant may elect one or the other, but not both.

The Lanham Act also "provides courts with the 'power to grant injunctions according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the [USPTO]." Phillip Morris USA, Inc. v. Felizardo, 2004 U.S. Dist. LEXIS 11154, at *28 (S.D.N.Y. June 18, 2004) (quoting 15 U.S.C. §1116(a)).   A permanent injunction may be obtained if the infringed can show: "(1) actual success on the merits and (2) irreparable harm." Gucci America, Inc. v. Duty Free Apparel, LTD., 286 F. Supp. 2d 284, 290 (S.D.N.Y. 2003).   Seruga/Excellent seek an injunction enjoining the following:

i.      using the ARTOFEX Mark or any similar designations alone or in combination with other terms, as a trademark, domain name, trade name component or otherwise;

ii.     otherwise infringing the ARTOFEX Mark;

iii.    causing likelihood of confusion or dilution of the distinctive quality of the ARTOFEX Mark

iv.     using the PH Designations or any similar designations alone or in combination with other terms, as a trademark, domain name, trade name component or otherwise;

v.      causing likelihood of confusion or dilution of the distinctive quality of the PH Designations; and

vi.     unfairly competing with [Seruga/Excellent] in any manner whatsoever.

(Answer ¶h) (Docket Entry No. 26 at 45.)   The Court has found that Zinn/Excalibur have previously

taken these actions and that they have harmed Seruga/Excellent as a result.  Zinn/Excalibur have not

provided any argument specifically directed towards Seruga/Excellent's demand for a permanent

injunction, and Seruga/Excellent have also failed to refer to it in its proposed findings of fact and

conclusions of law.  The State Court order dated April 16, 2003 (PX6), specifically provides that

Zinn/Excalibur "MAY make, advertise and sell replacement parts (and may use the designation Triple

Action Mixer and/or the designation PH15, PH20, PH30) which can be used with or substituted for

original Artofex equipment," and therefore, Zinn/Excalibur may use such designations appropriately

and in accord with non-infringing activities and so long as such statements are true.  The State Court

order is still in place and remains enforceable.  However, in accord with the spirit of the requested

injunctive relief, and given the Court's findings of fact and conclusions of law herein set forth, the

Court concludes that injunctive relief is warranted.  The Court has concluded that Zinn/Excalibur

have infringed the Mark, and therefore, any such future unlawful activity must be enjoined.

Therefore, the Court grants Seruga/Excellent's demands with one exception.  Zinn/Excalibur may

continue, in accord with the April 16, 2003 State Court Order, to "purchase, rehabilitate, advertise

for sale and sell use, rebuilt, re-machined or copied Artofex equipment" and shall be permitted to

"make, advertise and sell replacement parts (and may use the designation Triple Action Mixer and/or

the designation PH15, PH20, and PH30) which can be used with or substituted for original Artofex

equipment."  (PX6.)  The Court holds that insofar as Seruga/Excellent now requests an injunction

prohibiting these activities, in stating that they seek to enjoin Zinn/Excalibur from "using the PH

Designations or any similar designations alone or in combination with other terms, as a trademark,

74

domain name, trade name component or otherwise" that portion of Seruga/Excellent's demand for an injunction is denied.  Zinn/Excalibur shall be permitted to make replacement parts for ARTOFEX equipment so long as he does not represent that they are authentic ARTOFEX parts and so long as he does not act in any manner to contravene the injunctions the Court has put into place.

Seruga/Excellent also request that:

i.      [Zinn/Excalibur] maintain a ledger for all products sold under the ARTOFEX Mark;

ii.     [Zinn/Excalibur] provide copies of all advertising brochures and promotional materials using the ARTOFEX Mark to Seruga prior to public use, distribution or display;

iii.    [Zinn/Excalibur] destroy all counterfeit materials used in association with the ARTOFEX Mark including molds, copies and the means for making the copies;

iv.     [Zinn/Excalibur] disclose ownership of any domain names containing the ARTOFEX mark, or variations thereof or any similar designation;

v.      [Zinn/Excalibur] transfer any domain names incorporating the ARTOFEX mark, or any similar designation, to Seruga;

vi.     [Zinn/Excalibur] remove ARTOFEX, or variations thereof, from any metatags in any websites owned or controlled by or on behalf of, Plaintiffs; and

vii.    [Zinn/Excalibur] notify all search engines of the removal of such metatags and provide proof of same to Seruga.

(Answer ¶i) (Docket Entry No. 26 at 45-46.)

The Court concludes, in light of the Court's findings and conclusions, that the following relief is appropriate.  Zinn/Excalibur shall continue to maintain a ledger, pursuant to the State Court Order, "of all new customers and will log the source of this business."  In a similar ledger, Zinn/Excalibur shall record the products sold under the ARTOFEX Mark and the names of customers corresponding

75

to these sales, and this shall be done in order to assist in the future should further violations occur. Zinn/Excalibur is also ordered, if they have not already done so, to surrender control of the website at issue, "www.artofex-usa.com," and if they are still the owner, to transfer this ownership to Seruga/Excellent.  However, Zinn/Excalibur shall be able to continue to use the word "Artofex" in the metatags of the website or websites that they own or control because they service these machines, they are permitted to manufacture replacement parts so long as he does not otherwise violate any of the directions of this Court, and therefore the Court concludes that it is reasonable to permit him to include the word in search terms for search engines.  Such use of course is conditioned upon the fact that Zinn/Excalibur indeed continue to work with used Artofex equipment or make non-authentic replacement parts for such machines, or in some other way, accurately tie use of the word in the metatags to Zinn/Excalibur's actual scope of services.  Finally, the Court has not had occasion with the evidence presented to have reason to believe that any other violating websites exist, and therefore, Seruga/Excellent's requests regarding these hypothetical domain names and websites is denied.  In addition, the Court does not see that it is necessary for Zinn/Excalibur to provide copies of all advertising materials to Seruga/Excellent in the future.  These parties are competitors, and turning over such materials would compromise this fact.

In sum, the Court awards a total of $570,084.46 to Seruga/Excellent.


### 4.    Attorneys' Fees

Seruga/Excellent assert that they are entitled to their reasonable attorneys' fees under the Lanham Act, pursuant to 15 U.S.C. §1117(a), under New Jersey Law, and pursuant to the CSA. (Docket Entry No. 163 at 105.)  To the extent that the parties seek attorneys fees, the Court will

permit the filing of the appropriate motion with supporting legal arguments and exhibits, and will not consider the request for attorney's fees until the proper motions with adequate supporting documents are filed. Because no supporting documentation was provided, the Court denies the request at this time without prejudice.

## III.    CONCLUSION

For the foregoing reasons, the Court will deny Plaintiffs' Motions in Limine (Docket Entry No. 124); deny Defendants' Motion in Limine to Strike the Expert Report and Exclude the Proposed Testimony of William Morrison (Docket Entry No. 126); and grant Defendants' Motion in Limine to Exclude Unauthenticated Internet Printouts (Docket Entry no. 127).

On the basis of the evidence introduced at trial, the Court also concludes that Plaintiffs have failed to prove their claims under the Declaratory Judgment Act; that Seruga is the valid owner in the United States of both the '276 and '038 registrations; and that Defendants are not liable for unfair competition or false advertising.  The Court also concludes, in response to Defendants' causes of action, that Plaintiffs are liable for federal trademark infringement, federal unfair competition, counterfeiting in violation of federal and state law, federal cybersquatting, mark dilution in violation of federal and state law, breach of contract, and tortious interference, and that Plaintiffs are not liable for fraud.

Accordingly, the Court awards $570,084.46 to Seruga/Excellent.  The Court also grants the following equitable relief.  Zinn/Excalibur is enjoined from: (1) using the ARTOFEX Mark or any similar designation alone or in combination with other terms as a trademark for goods it manufactures, as a domain name, or as a trade name component; (2) otherwise infringing the

77

ARTOFEX Mark; (3) causing the likelihood of confusion or dilution of the distinctive quality of the ARTOFEX Mark; and (4) unfairly competing with Seruga/Excellent.  The Court also orders that Zinn/Excalibur shall: (5) maintain a ledger in which it records the used products it sells under the ARTOFEX Mark and the corresponding customers to whom these products are sold; and (6) surrender control of the website "www.artofex-usa.com" and transfer its ownership to Seruga/Excellent.

An appropriate form of Order accompanies this Opinion.

Dated: September 28, 2009

    /s/ Garrett E. Brown, Jr.    
GARRETT E. BROWN, JR., U.S.D.J.
